**Rufus LINDLEY et al., Petitioners,**

v.

**J. G. LINDLEY et al., Respondents.**

No. A–9844.

Supreme Court of Texas.

Oct. 7, 1964.

Rehearing Denied Nov. 11, 1964.

Joe N. Chapman, Sulphur Springs, Bird Old, Jr., Raymond R. Johnson, Sulphur Springs, for petitioners.

J. G. Lindley, Dallas, Howard S. Smith, Sulphur Springs, Woodrow H. Edwards, Mt. Vernon, for respondents.

WALKER, Justice.

This will contest was tried before a jury on appeal to the district court. In response to the single special issue submitted, the jury found that the testatrix had testamentary capacity. Judgment was rendered on the verdict admitting the will to probate, and the Court of Civil Appeals affirmed. 370 S.W.2d 740.

The will in question is a holographic instrument executed by the testatrix, Mrs. Sallie A. Lindley, on August 10, 1959. She died on June 2, 1960, at the age of 94, and was a widow at the time of her death. Three children had been born to her: Rufus Lindley, Mary Harper, and Tommy Lindley. Tommy died in the State Hospital at Terrell on July 23, 1959. He was survived by his wife, Dixie, and by three children: J. G. Lindley, Evelyn Redmond, and Juanita Irons. Rufus Lindley is married but has no children. Mary Harper is a widow and has three children: Oleta Smith, D. C. Hyder and Prentiss L. Hyder.

In the instrument offered for probate, the testatrix directed that her two surviving children, Rufus Lindley and Mary Harper, and one of her grandchildren, Prentiss L. Hyder, be paid $1.00 each. The residue of her estate was devised and bequeathed to the remaining five grandchildren in equal shares. J. G. Lindley and Juanita Irons, who were appointed executors without bond, filed the will for probate, and their application was contested by Rufus and Mary. The contestants alleged *inter alia* that their mother lacked testamentary capacity and that her execution of the will was procured by undue influence on the part of J. G. Lindley, Evelyn Redmond and Juanita Irons.

The charge to the jury included a definition of "testamentary capacity" which is quoted in the margin.[1] Contestants requested the submission of an insane delusion instruction, also set out in a footnote,[2] and

1. "You are further instructed that to make a valid will, the person making the will must have testamentary capacity at the time of the execution of the will. By the term 'testamentary capacity', as used in this charge, is meant that the person at the time of the execution of the will has sufficient mental ability to understand the business in which she is engaged, and the effect of her act in making the will, and the general nature and extent of her property. She must also be able to know her next of kin and the natural objects of her bounty. She must have memory sufficient to collect in her mind the elements of the business to be transacted and to hold them long enough to perceive at least their obvious relation to each other, and to be able to form a reasonable judgment as to them."

2. "To make a valid will, the person making the will must have testamentary capacity, and must not, at the time of the execution of the will, be laboring under an insane delusion, which influenced the person executing such will to dispose of her property in a way which she would not have disposed of it but for the insane delusion.

"You are charged in connection with the term 'testamentary capacity' that a person, to have testamentary capacity, as that term is used in this charge, is meant that such person at the time of the execution of the will, must have had sufficient mental ability to understand the business in which she was engaged, the effect of her act in making the will, and the nature and extent of her property; she must be able to know her next of kin and the natural objects of her bounty and their claims upon her; she must have memory sufficient to collect in her mind the elements of the business about to be transacted and to hold them long enough to perceive at least their obvious

their first point of error asserts that the court erred in refusing to submit the same.

A person who is entirely capable of attending to his business affairs may nevertheless have his mind so warped and deranged by some false and unfounded belief that he is incapable of formulating a rational plan of testamentary disposition. Examples of such false beliefs are cases where the "testator believed, in spite of the fact that all the evidence was to the contrary, that his son had been to the planet Mars and had conspired against the United States and should therefore be disinherited; or that his wife was plotting to kill him; or that his daughter had murdered his father; or that he was hated by his brothers and sisters who were bent on persecuting him." Page on Wills, Bowe-Parker Revision, § 12.29. When the testator's false belief amounts, in law, to an insane delusion and the terms of his will are influenced thereby, testamentary capacity is lacking even though he might know the nature and extent of his property, the effect of his will, and the natural objects of his bounty, and be able to handle complex business matters. A jury of laymen might well conclude that such a person did have testamentary capacity, however, if their only guide were the ordinary definition of that term. An additional instruction on insane delusions is required, therefore, where the issue is fairly raised by the evidence. See Prather v. McClelland, 76 Tex. 574, 13 S.W. 543; Rodgers v. Fleming, Com.App., 3 S.W.2d 77 (holding approved).

The courts have developed their own concept of what constitutes an insane delusion. It has been defined in Texas as "the belief of a state of supposed facts that do not exist, and which no rational person would believe." See Knight v. Edwards, 153 Tex. 170, 264 S.W.2d 692. Other courts have attempted to state the definition in terms of the proof necessary to establish an insane delusion in the case under consideration, but none of these definitions is so complete and accurate that it can be applied indiscriminately in every situation that may arise. According to one writer "all that can safely be said is that an insane delusion is a misconception of fact, or an abnormal mental attitude, due to some organic defect in the brain or some functional disorder of the mind. That it is so due may be inferred from its purport, if too fantastic to be the product of a normal mind; or from its fixed and persistent nature, if conceived without foundation in reason; or from its progressive immoderateness if originally induced by some rational cause; or from its origin in a previous state of irrationality. Formulas of proof cannot be followed literally. Each case must rest on its own circumstances, the question of law for the trial court being whether the contestant has introduced substantial evidence, not only of a mental error affecting the terms of the will, but that the persistence of this mental error was caused by defective cerebration." See Annotation, 175 A.L.R. 882, 889.

We agree with the Court of Civil Appeals that the jury's finding is amply supported by the evidence, but that does not solve our problem. Contestants were entitled to have an instruction on insane delusions given if there is any evidence of probative value which, with the inferences that may reasonably be drawn therefrom, will support a finding that Mrs. Lindley was laboring under such a delusion which affected the terms of her will. In determining that question, moreover, we must consider only the evidence which, when viewed in its most favorable light, tends to support such a finding, and must disregard all evidence that would lead to a contrary conclusion.

The evidence discloses that Mrs. Lindley's son, Tommy, suffered a complete mental breakdown in March, 1959. He was placed in the Hopkins County Memorial Hospital

relation to each other and to be able to form a reasonable judgment as to them.

"You are further charged that by 'insane delusion' is meant the belief of a state of supposed facts which no rational person would believe."

at Sulphur Springs, where it was necessary to tie him to his bed. Two days later he was transferred to Timberlawn Sanitarium in Dallas. After six weeks at Timberlawn, he was committed to the State Hospital at Terrell, and died there on July 23, 1959. Mrs. Lindley's will was written 18 days later.

Mrs. Lindley was 93 years of age and in poor health herself when Tommy became ill. The medical testimony shows that she was senile and suffering from high blood pressure and arteriosclerosis at the time. Tommy's illness and death caused severe distress and sorrow to his mother. She saw him tied to the bed in the Hopkins County Memorial Hospital, and according to one witness "just went to pieces." She also visited him frequently while he was at Timberlawn and in the State Hospital at Terrell, but evidently was never able to understand the nature of his illness. She told her banker, W. W. Jones, that her boy had been sent to Terrell, and that she was going to bring him home and take care of him herself. When Mr. Jones attempted to explain Tommy's condition and assured her that Terrell was the place for him, she "paid no attention to it whatever."

The evidence also shows that Mrs. Lindley entertained a number of false beliefs or delusions after Tommy's death. She told several witnesses, including three doctors, that she did not want to go to the Hopkins County Memorial Hospital because the hospital had killed her son. When she and some of her grandchildren returned to Sulphur Springs for Tommy's funeral, they spent the night at a local motel. The manager of the motel asked her how Rufus was getting along. She replied that "she didn't known and didn't care because * * he and Mary killed my son." A short time later she told another witness that "if it hadn't been for Rufus and Dixie, I would have my poor little child with me today," that "Rufus and Dixie sent Tommy to Terrell." She stated to a neighbor that the Hopkins County Memorial Hospital had mistreated Tommy, and that both she and

Tommy had been badly mistreated by Rufus and Mary, but the time of this conversation is not clear from the record. There is also evidence indicating her belief that she had talked with her deceased husband and son, and had seen Tommy when she went to his former home.

Several lay witnesses noticed a marked change in Mrs. Lindley after her son died. She failed to recognize old friends on the street and was unable to carry on a normal conversation. The witness Jones, whom Mrs. Lindley consulted frequently on business matters, testified that in his opinion she was mentally incompetent after Tommy's death. A doctor who saw her in June, July and August, 1959, also expressed the opinion that she was of unsound mind at the time of one visit when she discussed Tommy's death with him. Two doctors in Greenville who examined Mrs. Lindley on January 19, 1960, were of the opinion that she was of unsound mind at that time, and one of them testified that her condition would have been about the same on August 10, 1959. She suffered a stroke in March, 1960, and was sent to the hospital where she died about two months later.

The evidence shows Mary had lived with Mrs. Lindley and cared for her for some time prior to her death, doing the washing, cooking, house cleaning and nursing, and that Rufus also helped his mother in various ways. Mrs. Lindley had made three earlier wills, all of which were formal instruments prepared by an attorney. None of the children were left out of the first two wills, and Mary was named co-executor in at least one of them. The third will divided all property between the three children. Nothing was given to any of the grandchildren, but J. G. Lindley was appointed independent executor without bond.

Although the facts proven are not as strong, the present case is somewhat similar to Rodgers v. Fleming, supra, which was a contest of the will of W. J. McDonald. There the testator's beloved brother shot himself on April 22, 1925, and the will offered for probate was executed about two

and one half weeks later. The evidence indicated that the testator was generally able to attend to his business, although he was in bad health, forgetful, occasionally made mistakes, and had misgivings about his business ability. After the death of his brother, he purchased a pistol for the purpose of protecting himself against a nephew, Dr. Will McDonald, and said the nephew was going to kill him for his property. He also said that the wife of another nephew was an unscrupulous and designing woman and had stolen some of his table cloths and similar articles. Mrs. H. D. McDonald, the widow of his deceased brother, had prepared his meals for some time, and after her husband's death he asked her not to move away from Paris as she was planning to do. Later he stated that she was the meanest woman in the world. He also told the owner of a barber shop that astronomers would soon be able to see the gates of Heaven. A number of other circumstances were established which tended to show that the testator was not in full possession of his mental faculties, and in response to a lengthy hypothetical question an expert witness expressed the opinion that the testator was of unsound mind on the day his will was executed. The will made cash bequests to a nephew, two nieces and their children, left nothing to Dr. Will McDonald, and gave the bulk of a very substantial estate to the Regents of the University of Texas for the purpose of constructing and equipping an astronomical observatory. The Commission of Appeals held that the trial court had erred in refusing to give the special charge on insane delusions requested by the contestants, and stated that its conclusion was based not only upon the facts established by the evidence but also upon the opinion of the expert witness that the testator was of unsound mind.

The proponents call our attention to the considerable body of evidence which would support the conclusion that Mrs. Lindley did have testamentary capacity and may have had good reasons for disposing of her property as she did. They rely upon Knight v. Edwards, supra, and Navarro v. Rodriguez, Tex.Civ.App., 235 S.W.2d 665 (no writ). Neither of these cases is applicable here. We held in Knight that the evidence failed to raise the issue of insane delusions because there was a reasonable and substantial factual basis for the belief held by the testatrix. And as pointed out by the Court of Civil Appeals in Navarro, the record there contained "nothing more than the suggestion of a misunderstanding or a mistake of fact, or an illogical conclusion."

■ It is not clear here whether there was any basis for Mrs. Lindley's belief that Rufus and possibly Mary played some part in having Tommy sent to the hospital. There is evidence which indicates that she believed someone had told her this. On the other hand, Tommy's wife testified that she and J. G. Lindley signed the necessary papers, and that neither Rufus nor Mary had anything to do with her husband's commitment to the State Hospital at Terrell. Entirely aside from that problem, however, there appears to be no basis whatsoever for Mrs. Lindley's belief that Tommy was killed by the hospital or that his life would have been spared if he had not been sent there. Under all the evidence, the jury could reasonably conclude that she was firmly convinced that one or both of her children were responsible for Tommy's death, that such belief would not have been entertained by a rational person under the circumstances but was the result of mental infirmity, and that the disposition of her estate was affected thereby. Since there is no contention that the instruction requested by contestants is not in proper form, we hold that the trial court erred in refusing to give the same.[3] This requires that the cause be remanded for a new trial.

3. The instruction requested by contestants has been approved by at least one of our Courts of Civil Appeals. Peareson v. McNabb, Tex.Civ.App., 190 S.W.2d 402

(writ ref. w.m.). See also Gulf Oil Corporation v. Walker, Tex.Civ.App., 288 S.W.2d 173 (no writ). It undoubtedly informed the jury of the legal effect of

■■ · An expression of our views on a number of other questions brought forward by contestants will be of assistance to the parties and the court when the case is retried. In support of their contention that an issue on undue influence should also have been submitted, contestants call our attention to evidence of declarations by Mrs. Lindley, in which she recounted statements made to her by some of the grandchildren. These declarations on the part of Mrs. Lindley may be received to show her mental condition, but they constitute hearsay and have no probative value when offered to prove the truth of the facts she asserted. See Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138; Buchanan v. Davis, Com. App., 12 S.W.2d 978; Wigmore on Evidence, 3rd ed. 1940, § 1738. Aside from the testimony just mentioned, the only circumstances tending to support contestants' position are the testator's mental and physical condition, many opportunities for the grandchildren to influence her, and the terms of the will itself. Mrs. Lindley's plan of testamentary disposition is not necessarily an unnatural one, and in our opinion there is no evidence, direct or circumstantial, from which it can reasonably be inferred that her execution of the will was the result of undue influence. See Rothermel v. Duncan, Tex. Sup., 369 S.W.2d 917.

■ The jury was instructed that "every person who has attained the age of nineteen years or who is or has been lawfully married, being of testamentary capacity, shall have the right and power to make his last will and testament under the rules and limitations prescribed by law." This in-struction had no place in the charge. The information it contained did not assist the jurors in passing on the issue submitted to them, and it served merely to confirm what they probably already knew about the legal effect of their answer. We also agree with contestants that the words "and their claims upon her" should have been added to the second sentence of the definition of testamentary capacity. See Morris v. Morris, Com.App., 279 S.W. 806 (holding approved); Breeding v. Naler, Tex.Civ.App., 120 S.W.2d 888 (writ dism.).

■ Doctors Mehmert and Phillips examined Mrs. Lindley for the first time on January 19, 1960, but this was not so remote as to preclude these witnesses from expressing their opinion, based on reasonable medical probability, regarding her condition when the will was executed five months earlier. The trial court properly refused, however, to permit Dr. Phillips to testify that Mrs. Lindley's belief that the Hopkins County Memorial Hospital had killed her son was an insane delusion. As suggested by our opinion in Knight v. Edwards, supra, a doctor's concept of what constitutes an insane delusion may be quite different from the legal concept. No witness, whether expert or non-expert, is permitted, over proper objection, to state his opinion as to the legal capacity of a person to make a will, because the determination of the existence of testamentary capacity involves the application of a legal definition to the facts. See Brown v. Mitchell, 88 Tex. 350, 31 S.W. 621, 36 L.R.A. 64; McCormick & Ray, Texas Law of Evidence, 2nd ed. 1956, § 1421. For the same reason even an expert medical witness

their answer, but that is not a sound reason for refusing to submit the same in view of the other instructions given by the trial court. While the question is not briefed or argued here, we are inclined to the view that contestants would have been entitled, upon proper request, to an even more favorable instruction. If the one sought by them had been given and the jurors concluded that the testatrix was laboring under an insane delusion which affected her will, they could still have answered the issue on testamentary capacity in the affirmative unless they realized that the mistaken belief of the testatrix prevented her from knowing the children's claims upon her. This danger as well as the defect noted above can be obviated by specifically relating an insane delusion to testamentary capacity. See Rodgers v. Fleming, Com.App., 3 S.W.2d 77. We do not attempt to express an opinion as to the exact form in which the instruction might be given.

is not qualified to say, in so many words, that a particular belief held by the testator constituted an insane delusion.

Contestants also contend that the trial court erred in refusing to allow them to impeach Mrs. Dixie Martin, whom they called as a witness, but this question probably will not arise at the next trial.

The judgments of the courts below are reversed and the cause is remanded to the district court for a new trial.