William M. PEARCE, Petitioner,

v.

Floyd M. CROSS, Respondent.

No. A–11424.

Supreme Court of Texas.

Nov. 2, 1966.

Rehearing Denied Dec. 14, 1967.

Garrett & Garrett, Fort Worth, for petitioner.

Brown, Day & Crowley, Fort Worth, for respondent.

CALVERT, Chief Justice.

The only question presented by the appeal in this case is whether there is in the record evidence of probative force supporting a jury finding that execution of a will by Mrs. Effie Ferguson on September 1, 1961, was procured by undue influence exercised by her sister, Mrs. Della Pearce. A judgment of the district court, based on the jury finding, denying probate of the September will and admitting an earlier will, dated July 27, 1961, to probate, was affirmed by the court of civil appeals. 400 S.W.2d 622. We affirm.

Petitioner, William M. Pearce, a nephew of Mrs. Ferguson and named as independent executor in both wills, offered the September will for probate. Respondent, Floyd M. Cross, surviving husband of Mrs. Ferguson's daughter, an only child, and a beneficiary under both wills, contested probate of the September will and offered the July will for probate.

In affirming the judgment of the trial court, the court of civil appeals held that the

jury finding that execution of the September will was procured by undue influence was supported by evidence of certain declarations made by the testatrix after the will was executed. In this connection the court said (400 S.W.2d 624):

> Although all the evidence which was adduced on the point were declarations of the testatrix after the fact of execution of the new will, we consider such competent to prove the existence of undue influence inducing testatrix' act, and also her state of mind at the time.

The holding that the declarations are evidence "of the existence of undue influence inducing testatrix' act" is contrary to the rule recognized by this court in Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138, 1144 (1914), that a testator's "declarations are not competent to prove the fact of undue influence." The correct rule with respect to declarations of the testator in undue influence cases is succinctly summarized in McCormick & Ray, Texas Law of Evidence, § 894 (2d ed. 1956), as follows:

> Undue influence as an invalidating fact consists of two elements: first, the *external,* the words or acts of third persons which bring the pressure to bear; second, the *internal,* the collapse of the testator's own will, produced by such external conduct. It is held that declarations of the testator, of whatever type, are no evidence of the former but only of the latter element.[1]

We reaffirmed the rule as recently as 1964. See Lindley v. Lindley, 384 S.W.2d 676, 682 (Tex.Sup.1964).

 Having concluded that declarations of the testatrix are not evidence of the fact of undue influence, we must look elsewhere for proof of that element of the issue. There is in the record no direct evidence of the fact of undue influence, but the fact may be established by circumstantial evidence. Long v. Long, 133 Tex. 96, 125 S.W.2d 1034, 1036 (1939). A review of the evidence is required.

Mrs. Ferguson died June 28, 1962, at age 82. Her estate, having an appraised value of $73,310.50, consisted principally of cash on deposit in banks and savings and loan institutions. Her home was valued at $7,500.00. Article II of the July will contains a bequest of $1,000.00 in cash and a devise of a life estate in the home to Floyd M. Cross. The will contains no other specific bequest or devise. The remainder interest in the home and all other property is disposed of in the residuary clause of the will one-third to the testatrix' sister, Della M. Pearce, and two-thirds in trust for the benefit of Mrs. Pearce's two sons during their lives with remainder to their children. The only material change made in the July will by the September will was elimination of the devise of a life estate in the home to Cross and reduction of the money bequest to him from $1,000.00 to $125.00. The inquiry thus narrows to whether there is evidence in the record from which the jury could reasonably infer and conclude that this change was procured by undue influence exercised by Mrs. Pearce.

Evidence in the record leaves no doubt that Cross was a natural object of Mrs. Ferguson's bounty, and, indeed, that Mrs. Ferguson considered herself at least morally obligated to devise to him a life estate in the home. Cross and his wife, Jewell, lived with Mrs. Ferguson in her home for some twenty years. During that period of time, Mrs. Ferguson and Jewell, who had no children, got along with each other "wonderfully. They were almost inseparable. Wherever one went the other was there;" and Jewell and the respondent, Cross, were "very happy" together. Jewell died June 29, 1961, but Cross continued to live in Mrs. Ferguson's home until her death one year later.

When Mrs. Ferguson discussed the drafting of the July will with her attorney, she told him that her daughter had died only recently and expressed the "highest love and care for her." She said that Cross "had been better to her than a son could be,"

1. Emphasis the authors'.

and told him that several years before she had entered into an agreement with her daughter and son-in-law that "if they would dispose of their home or whatever they had and move in with her and take care of her, that that home would be their home the rest of their life and that they did." She insisted that the attorney write into the will the following sentiment: "I would like to take this opportunity to also express my appreciation of my beloved son-in-law, Floyd M. Cross, for that kind and tender care which he extended me during my stay here on earth."

There is no suggestion in the evidence that the legacy to Cross contained in the July will did not represent Mrs. Ferguson's wish at the time the will was executed. Instructions for preparation of the will were given by Mrs. Ferguson in her home and were given by her alone. Cross was not in the room at the time. The will was also executed in Mrs. Ferguson's home, at a time when Cross was not in the house.

There is no evidence in the record of a change in the relationship between Cross and Mrs. Ferguson between July 27 and September 1, 1961, or thereafter, which would justify a reasonable belief that Mrs. Ferguson concluded that Cross no longer had a claim on her beneficence or that she no longer felt a moral obligation to fulfill her agreement made with him and her daughter. Indeed, the evidence is all to the contrary. A nurse who was employed by Mrs. Pearce and who lived in Mrs. Ferguson's home and cared for her from July 15 to October 15, 1961, testified that Cross "lost many a night's sleep helping out in taking care of" Mrs. Ferguson; that Mrs. Ferguson "seemed to be very fond of Mr. Cross," and said "numbers of times that he had been so good to her and was still good to her." Another nurse employed by Mrs. Pearce and in the home from October, 1961 until January, 1962, testified that Cross helped care for Mrs. Ferguson and looked after the laundry and bought all the groceries; that

when Cross was away, Mrs. Ferguson would "want to know where he was and when he was coming back" and said she "didn't know what she would do without Floyd." A third nurse who was also employed by Mrs. Pearce and went to work about March 1, 1962, testified that Cross helped with Mrs. Ferguson and was "wonderful" to her; that Mrs. Ferguson worried about Cross "from the time he left the house until he came in * * * thought the world and all of" him, and "did not want him ever to leave her."

The September will was drafted and executed under circumstances differing entirely from the circumstances surrounding the drafting and execution of the July will. Mrs. Pearce exhibited an interest in the July will soon after it was executed. The attorney who prepared the will sent a copy to Mrs. Pearce's son in Houston who was named independent executor in the will. Thereafter, Mrs. Pearce telephoned the attorney and wanted to know the contents of the will, but the attorney refused to divulge them. She then asked if a copy had been sent to her son, and upon being advised that it had been, she said, "Well, I'll find out what's in it." Sometime later, Mrs. Pearce telephoned the attorney and told him "she had talked to Mrs. Ferguson and *they* wanted to change the will."[2] She asked the attorney to come by her house, which he did the next morning. Mrs. Pearce told the attorney that she had authority to speak for Mrs. Ferguson and that "*they* wanted Article II changed leaving the life estate out and knocking the $1000.00 out." Mrs. Pearce asked, "would it be legal if *we* left him a dollar?" And when the attorney "kind of snickered," she said, "Well, let's leave him a hundred or something like that." She finally suggested the figure of $125.00. Mrs. Ferguson never called the attorney about changing the will, and he never talked to her about changing it.

On September 1 Mrs. Pearce went for Mrs. Ferguson in her car and drove to the parking lot of a bank where, by prearrange-

2. Emphasis ours unless otherwise indicated.

ment, she was to meet the attorney who was to arrange for witnesses to the execution of the new will. When the attorney arrived at the parking lot, Mrs. Ferguson was being helped from the bank by Mrs. Pearce. The three sat in the front seat of the attorney's car, the attorney under the wheel, Mrs. Ferguson in the center and Mrs. Pearce on the right-hand side, while the attorney explained the change which had been made in the writing of the new will and that the new will would revoke or cancel the July will. Mrs. Ferguson "nodded her head yes or said yes," the attorney did not remember which. Two officers of the bank were present as attesting witnesses and a bank employee was present to take the required acknowledgments to the self-proving affidavit. While the will and the self-proving affidavit were being executed, Mrs. Pearce surrendered her seat in the car to the notary but remained "in the immediate area all the time." The executed will was delivered to Mrs. Pearce who took it into the bank while Mrs. Ferguson remained in the car.

We turn our attention now to the evidence showing the relative personalities and dispositions of the two principal actors in the drama—Mrs. Ferguson and Mrs. Pearce—and their relationship, conduct and activities. Mrs. Ferguson was 81 years of age when she executed the two wills. When the attorney who prepared the wills visited her in her home in July, he found her to be "in declining health" and grieving over the recent loss of her daughter. He testified that Mrs. Ferguson "seemed to have been, and was at that time, a very sweet, kind, gentle woman." The nurse in the home from July 15 to October 15, 1961, testified that Mrs. Ferguson's "health was bad and her strength was weakening by the day," and "her mind was weakening with her body." One of the witnesses who attested execution of the September will testified that at that time Mrs. Ferguson was not very strong and talked weakly; the other testified that she "was feeble," and the attorney testified that she "was in ailing health and was tired." According to the testimony of the first nurse,

Mrs. Pearce was a much stronger person than Mrs. Ferguson and was much stronger "in her talk and conversation."

Soon after Jewell's death Mrs. Pearce began making frequent visits to the Ferguson home. The first nurse testified that Mrs. Pearce never came to the house to "try to do anything for her sister or comfort her in any way," her visits "worried" Mrs. Ferguson, and she appeared intent upon getting Mr. Cross out of the house; Mrs. Pearce told Mrs. Ferguson "numbers of times * * * that they just had to get Floyd out of the home, that he was there for no good and that he was just hanging around there for what he could get." Asked if "those particular conversations did anything about upsetting Mrs. Ferguson," the witness answered: "Oh, they did very much. She'd get awful nervous after Della would come down and go back, and I'd have to work with her. She'd get awfully nervous." On one such occasion Mrs. Ferguson told Mrs. Pearce, "Listen, Floyd is not in this home because he wants to be. I asked him and Jewell to move here in this home and take care of me in my old days." The nurse also testified that Mrs. Pearce would come to the house "to borrow money or to get her some cigarettes," prompting Mrs. Ferguson to say on one occasion, "It's got so here she * * * never comes about me only when she wants money or wants me to buy her something." Mrs. Ferguson had the witness hide her purse to prevent Mrs. Pearce from finding it, and had the witness carry her bank box key in her uniform pocket because she couldn't "trust Della with them." The nurse quit her job because "Mrs. Pearce was running me crazy."

According to the testimony of the second nurse, when Mrs. Pearce came to the house she was always complaining to Mrs. Ferguson "about the expenses of the nurses and all the medicine she was taking," and Mrs. Ferguson "was always nervous and upset when Mrs. Pearce left." At times Mrs. Pearce took Mrs. Ferguson's "wearing apparel out" and took it home. This nurse al-

so quit as a result of a quarrel with Mrs. Pearce.

The third nurse testified that she was told by Mrs. Pearce before she went to the Ferguson home that "Mr. Cross was stealing * * * and she intimated that he had been familiar with all the nurses;" that Mrs. Pearce also told the witness that if she "would stick by her and do as she said, that I would have a living the rest of my life." She testified further that at times when Mrs. Pearce came to the house she "took quite a lot of things out of Effie Ferguson's closet" and took away from the house bedspreads, quilts, dishes and clothing; and while doing so she accused Cross of taking things. Asked if Mrs. Pearce would "talk kindly or otherwise" to Mrs. Ferguson, the witness replied: "Well, she got pretty rough at times. She would tell Effie Ferguson just exactly how things were supposed to go around there and it did upset Mrs. Ferguson an awful lot."

Considering only the evidence here summarized at considerable length and in some detail, we cannot say that the jury was unauthorized reasonably to infer that Mrs. Pearce exercised undue influence on Mrs. Ferguson to procure the change made in the July will by the September will. This inference could reasonably have been reached from direct evidence of Mrs. Ferguson's deep affection for and sense of obligation to Cross and her inclusion of the legacy to him in the July will which was dictated by her alone; the continued display of affection, without diminution of intensity, to and including the date of execution of the September will and throughout the remainder of her life; the determined effort of Mrs. Pearce to prejudice Mrs. Ferguson against Cross and to obtain all of Mrs. Ferguson's property for herself and her descendants, even to the point of taking some of it while Mrs. Ferguson still lived; the preparation of the September will at the instance and according to instructions given alone by Mrs. Pearce at a place where Mrs. Ferguson could not hear or participate; the practical elimination by the September will of the only dispositive provisions in the July will which did not benefit Mrs. Pearce and her descendants and their consequent benefit from the change; the intimate presence of Mrs. Pearce during explanation by the attorney to Mrs. Ferguson of the change which had been made and her nearby presence during its execution, and the taking of the executed will into her possession by Mrs. Pearce and the keeping of it under her control.

Our conclusion that the evidence reasonably supports an inference of the fact of undue influence does not, standing alone, give vitality to the jury finding that the September will was procured by undue influence. We must also find that the evidence will support a reasonable inference that the influence was such as to destroy the free agency of the testatrix and produce a will which she would not otherwise have made. Rothermel v. Duncan, 369 S.W.2d 917, 922 (Tex.Sup.1963). It is on this issue that declarations of the testatrix are competent evidence as showing the state of mind of the testatrix at the time of execution of the instrument. Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138(1914). There are such declarations.

After the September will had been executed, Mrs. Pearce returned Mrs. Ferguson to her home. While the nurse was getting Mrs. Ferguson ready for bed, she said: "Della took me down and had me to just make another will and completely willed Floyd out of my property, my home and everything. I feel awful bad about it." According to the nurse, Mrs. Ferguson also said: "Della wanted it that way and would have it that way;" and she "mentioned several times she felt awful bad about it."

Within a week or two after the September will was executed, Mrs. Ferguson telephoned the attorney and said she wanted to make a new will to devise a life estate in the home to Cross. When asked by the attorney why she had executed the second will, she said that "Della had just been riding her so that she decided to do it." After further

discussion, the attorney asked, "Gosh, just why did you do it?" And she replied, "Well, Della made me." Asked why she did not get the will and tear it up, Mrs. Ferguson answered, "I can't. Della has got it locked up down at the safety deposit box." Shortly after the conversation, Mrs. Ferguson's illness became more serious and she went to the hospital. The attorney never heard from her again.

The foregoing declarations disclose that at the time Mrs. Ferguson executed the September will she still felt an obligation to leave her home to Cross and was deeply anguished that she had executed an instrument which did not do so. When these declarations are added to the evidence heretofore summarized, and consideration is given to evidence from which the jury could reasonably infer that when Mrs. Ferguson executed the will she was a gentle person, frail in body and mind and weak of will, and thus more likely than a person in normal physical and mental health to yield to pressing persuasions and impositions; and that Mrs. Pearce was a quarrelsome, domineering and avaricious person; together with the statements of Mrs. Pearce indicating that she was arrogating to herself an equal right with Mrs. Ferguson to determine what part of the property, if any, was to be left to Cross, and the effect other efforts of Mrs. Pearce to influence and dominate Mrs. Ferguson had on her, we have no difficulty in holding that the jury was reasonably authorized to infer and conclude that in the writing of the September will Mrs. Ferguson's own free will and volition were subverted and destroyed by inordinate persuasions on the part of Mrs. Pearce, and that she was thus induced to execute a will which she would not otherwise have executed.

As had often been said by this court, every case of undue influence must be decided on its own peculiar facts. See Rothermel v. Duncan, 369 S.W.2d 917 (Tex.Sup. 1963); Long v. Long, 133 Tex. 96, 125 S.W. 2d 1034 (1939). Rothermel v. Duncan, supra, and Curry v. Curry, 153 Tex. 421, 270 S.W.2d 208 (1954), are so obviously distinguishable on their facts that they need not be analyzed at length.

The judgment of the court of civil appeals is affirmed.

GRIFFIN, SMITH, and NORVELL, JJ., dissenting.

GRIFFIN, Justice (dissenting)

I am unable to agree with the disposition made of this cause by the majority opinion.

I take it there is no disagreement that the declarations of Mrs. Ferguson are hearsay and competent only to prove her state of mind *after* a prima facie case of undue influence has been made. Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138, 1144; Lindley v. Lindley, Tex.Sup., 384 S.W.2d 676, 682 (1964). I propose to demonstrate that the facts in this case do not support such a prima facie case. The evidence, as analyzed below, shows efforts by Mrs. Pearce to exert undue influence on the mind of Mrs. Ferguson, but the evidence also shows such efforts were of no avail.

Undue influence that is sufficient to set aside a will is composed of two elements. First: It must be proven either directly or by circumstances that the undue influence, or its attempted exertion, existed; and second: That such undue influence was effectually exercised, its purpose accomplished and the will thereby produced. Scott v. Townsend, supra, 166 S.W. p. 1144.

"Thus, before a testament may be set aside on the grounds of undue influence the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator *at the time of the execution of the testament;* and (3) the execution of a testament which the maker thereof would not have executed but for such influence." Rothermel v. Duncan, Tex.Sup., 369 S.W.2d 917, 922 (1963).

Now, keeping in mind the rules of law governing cases such as this, let us examine all the admitted testimony in this record which the majority says tends to show that Mrs. Pearce exerted undue influence upon Mrs. Ferguson and procured the execution of the September 1st will contrary to Mrs. Ferguson's wishes.

The testimony of the nurses demonstrated that Mrs. Pearce was quarrelsome with Mrs. Ferguson, that Mrs. Pearce objected to the employment and expense of so many nurses, and that Mrs. Pearce attempted to get Mrs. Ferguson to do without so many nurses thus lessening the expense. However, the record shows that although Mrs. Pearce tried to influence Mrs. Ferguson in this regard she was unable to do so. All of Mrs. Pearce's efforts were apparently fruitless, evinced by the fact that Mrs. Ferguson continued with the same nursing services at presumably the same expense. Thus we are forced to the conclusion that with regard to this item Mrs. Ferguson was not influenced by Mrs. Pearce's desires.

Mrs. Pearce also tried to reduce the quantity and quality of medicines and prescriptions used by Mrs. Ferguson in treatment of her illness. Her effort here was equally fruitless. Mrs. Ferguson continued to use these same medicines. There is no evidence that Mrs. Pearce's position, that "a little wine and eggnog" was sufficient medicine, was adopted; Mrs. Ferguson's will was not overcome.

Mrs. Pearce attempted to substitute her will for Mrs. Ferguson's regarding Mr. Cross living in the home. Mrs. Pearce tried to force Mrs. Ferguson to have Mr. Cross move out, but Mrs. Ferguson was unmoved. Mrs. Ferguson "talked right up" to Mrs. Pearce. She said that Cross was in the home by invitation, that she wanted him there and that he was going to stay—and he did. This again shows that Mrs. Ferguson exercised her own will and volition contrary to the efforts and importunities of Mrs. Pearce.

The occurrences described above are relied on by the majority as circumstantial evidence tending to prove that Mrs. Pearce was successful in subverting the will of Mrs. Ferguson in regard to her testamentary disposition; yet, it tends to prove the opposite. The fact that Mrs. Pearce was unable to control Mrs. Ferguson's decisions in regard to the matters discussed above tends to prove that she did not control Mrs. Ferguson's decisions at the time of the execution of the will.

We next come to the preparation of the September 1st will. This testimony, standing alone, might indicate Mrs. Pearce dictated the terms of Article II of this will. This evidence is somewhat similar to that in Curry v. Curry, 153 Tex. 421, 270 S.W.2d 208 (1954), in which the beneficiary under a deed had gone to a lawyer in an adjoining county and had the lawyer prepare a deed for the grantor's signature. The deed conveyed the property in dispute to the beneficiary, son of the grantor, to the exclusion of the grantor's other children. The son-grantee informed the lawyer as to the terms of the deed. The father, grantor, was not present at this lawyer's office at the time the deed was prepared. The son procured the notary and the persons present when the deed was executed, and although not in the hospital room with his father at the time the deed was signed, he was in the "immediate vicinity" of the signing.

This Court reversed the judgment of the Court of Civil Appeals, which had reversed the trial court's judgment for the son "notwithstanding the verdict." This Court affirmed the trial court's judgment on the ground there was no evidence to support the jury's verdict that the execution of the deed had been procured by undue influence exercised by the grantee-son over the grantor-father. In discussing the fact that the son had the deed prepared and told the attorney the terms and conditions of the deed, this Court said: "There is no direct testimony that the grantor had nothing to do with the preparation of the deed and did not know it had been prepared until it was

presented to him, but there is testimony from which the jury might reasonably have drawn such an inference." p. 210–211. Following this the Court said the existence of these circumstances and inferences does not mean they were of such probative force as to support the jury finding of undue influence. The Court further said that it attached no weight to the fact that the grantee-son arranged for the notary and attesting witnesses.

In the case at bar the record shows it was Mrs. Ferguson's attorney who drew the will of September 1st in accordance with Mrs. Pearce's statement that "we want" Article II changed so as to leave Mr. Cross only $125.00. Here, as in Curry v. Curry, supra, there is no evidence that Mrs. Ferguson was in ignorance of the new Article II. In fact, the circumstances surrounding the execution of the will show the contrary. The attorney had represented Mrs. Ferguson in preparing the July 21st will. She had called him to discuss a third will after the September 1st will had been executed.

At the execution of the will in question Mrs. Ferguson, her attorney, and Mrs. Pearce met at the bank parking lot, and the attorney explained to Mrs. Ferguson the meaning and effect of Article II of the September 1st will. Again, after the two officers of the bank and the secretary-notary had come to the car occupied by Mrs. Ferguson, the attorney read Article II to Mrs. Ferguson and explained its legal effect. He again in the presence of the subscribing witnesses and notary asked Mrs. Ferguson if she understood the new Article II; if this set forth her wishes; and if she wished to execute the will and have it witnessed and authenticated. Upon her affirmative answer the attorney presented the will to Mrs. Ferguson, and she signed her name at the bottom of each page of the will and at the place provided for her signature, both on the last page of the will and also at the end of the self-proving certificate. The witnesses signed their names in similar fashion, and the notary

authenticated the self-proving part of the will.

Sec. 59 of the Probate Code, V.A.T.S., requires that a certificate be executed by the testator and the subscribing witnesses in order that the will may be self-proving. Among other things, the officer taking the self-proving acknowledgment must certify that the testatrix declared to the officer and the witnesses that said instrument was her last will and testament and that she had willingly made and executed it as her free act and deed. The certificate attached to the will of September 1st contained the statutory language. The record is void of any evidence that while Mrs. Ferguson was signing her will, or while the notary was taking her acknowledgment to the self-proving part, Mrs. Ferguson said or did anything to indicate that anyone (including Mrs. Pearce) had influenced her to make this will contrary to her own wishes and desires. She never protested, either by word or act, that she did not understand the provisions of the will or that this was not the way she wanted to dispose of her property. During the time Mrs. Ferguson, the attorney, and the subscribing witnesses and notary were signing the will and the self-proving certificate, Mrs. Pearce was not in the car and was not saying or doing anything to force Mrs. Ferguson to sign these papers. The evidence shows that only the attorney, Mrs. Ferguson and the notary were in the car, and that the attesting witnesses were standing next to the front doors of the car in order that they might affix their signatures as witnesses and notary. Mrs. Pearce was out of the car and walking around in the parking lot near to or "in the immediate vicinity" of the car. No evidence or circumstance is contained in the record to show that Mrs. Pearce was exerting any influence—undue or otherwise—over the will of Mrs. Ferguson at the time of the execution of the will.

In my opinion, the record herein fails to establish that Mrs. Pearce unduly influenced Mrs. Ferguson in the execution of this will. There is no evidence, circumstantial

or otherwise, to establish the presence of undue influence. At best, the evidence shows only unsuccessful efforts on the part of Mrs. Pearce to influence the decisions of Mrs. Ferguson. The fact of undue influence not having been established, the declarations of Mrs. Ferguson which tend to show the state of her mind, become of no consequence. I would reverse and render this cause.

SMITH and NORVELL, JJ., join in this dissent.