Leslie Ruland GREEN and Martha Mae
Green, Appellants,

v.

Thelma B. GOANS, Appellee.

No. 6115.

Court of Civil Appeals of Texas,
El Paso.

Oct. 7, 1970.

Rehearing Denied Oct. 21, 1970.

Sam W. Callan, Malcolm McGregor, Philip T. Cole, El Paso, for appellants.

Glenn Woodard, Calamia & Fashing, El Paso, for appellee.

## OPINION

FRASER, Chief Justice.

This is an appeal from a judgment of the District Court of El Paso County, Texas, which judgment upheld a will made by testator in July, 1966, in favor of appellee, and denied probate to a will made by the same testator in favor of appellants in 1964. In other words, the cause of action is a contest regarding two wills made by Walter Haliday White, testator.

It is in the record that testator stated that he didn't know of a relative he had had in fifty years; so we have here two wills, both made out to friends only, as the testator apparently had no relatives.

The pertinent part of the trial court's charge and the jury's answer thereto is as follows:

"You are instructed that to make a valid Will, the person making the same must have testamentary capacity and he must not at the time of the execution of the Will, be laboring under an insane delusion, which influenced the person executing the Will to dispose of his property in a way which he would not have disposed of it but for the insane delusion.

"In connection with the term 'testamentary capacity', I instruct you that a person, to have testamentary capacity, as that term is used in this Charge, is meant that such person at the time of the execution of the Will, must have had sufficient mental ability to understand the business in which he was engaged,

the effect of his act in making the Will and the nature and extent of his property. He must have been able to know his next of kin, if any, and the natural objects of his bounty and their claims upon him; he must have had memory sufficient to collect in his mind the elements of the business about to be transacted and to hold them long enough to preserve at least their obvious relation to each other and to be able to form a reasonable judgment as to them.

"You are instructed further, that by 'insane delusion' is meant the belief of a state of supposed facts which no rational person would believe.

"Now, bearing in mind the foregoing and any other instructions that may be given you by the Court or under its direction, in connection with the Issue hereinafter submitted, please make a finding on the following Special Issue:

## "QUESTION NO. 1

"From a preponderance of the evidence, do you find that WALTER H. WHITE had testamentary capacity when he executed the Will of July 15, 1966 (Plaintiff's Exhibit 1)? Answer 'He did' or 'He did not', as you may find.

"We answer He did."

(NOTE: The line drawn through "He did not", in the above Question No. 1, is as shown in the Transcript.)

The facts appear to be that in 1963 the testator, who was a machinist and had been appellant's friend for years, moved in to live with them in a room which they added to their home for him. There is testimony in the record that at this time, and up until late 1964, testator had been an alert, interested and helpful man. He made out a will in favor of appellants in September, 1964. In November of the same year he began to have back trouble, and it appears from the record that he began to have delusions about the same time, because in late 1964 he called a friend, a Mr. M. Lane

Johnson, to appellants' home while they were away and told said Johnson that appellants were trying to kill him, and pointed out to Mr. Johnson that the burners on the electric stove were on as proof of his belief. In December of 1964 he told the same witness that appellant Mr. Green had tried to electrocute him while they were doing some electrical work. Relations between appellants and testator worsened, and appellant Mrs. Green became afraid of testator because, during the Christmas season of 1964, he had tried to slip up on her. After this incident, appellants put a lock on testator's door so that he could not enter appellants' home unless they wished him to. Testator was hospitalized in January and May of 1965. After leaving the hospital the second time, testator expressed dissatisfaction with his arrangement at appellants' home and complained to appellee's husband, Mr. Goans, and his friend who worked with him in a mortuary, that the Greens were rifling his effects. It is also in the record that testator again told the witness Johnson that appellants were trying to kill him, and that they had stolen pajamas and shirts which they had given him. This conversation occurred on the street on or about June 17, 1966.

In 1965, testator had changed his life insurance to appellee and her husband, some five months after he had moved away from the Greens' home and moved in with the Goans. The record shows, also, that testator began to make accusations to a witness named Ohlenforst, that appellee and her husband were trying to poison him, and had said witness secretly advertise for another apartment for testator. According to the record, a Mrs. Myrtle Doty, who lived with appellee and the testator, was apparently afraid of testator. Shortly after June 17, 1966 and the conversation between testator and the witness Johnson, appellee's husband died. On July 15, 1966, testator made and executed a will in favor of appellee, which is the will that the court here allowed to go to probate. Several months after executing this will, testator was back in the hospital, at

which time he suffered a grand mal seizure, and shortly thereafter he suffered another grand mal seizure. He was hospitalized once more before his death. The hospital records indicate that the testator was suffering from arteriosclerosis as early as May, 1965, and the records of the hospitalization of November 1966, according to testimony, indicated that he was suffering from organic brain disease, a possible tumor, and senile paranoia. On March 29, 1968, the testator walked around the corner of appellee's house, shot and wounded appellee and Mrs. Myrtle Doty, and then fatally shot himself. He was 82 years of age at the time of this occurrence.

The record is replete with testimony, pro and con, as to the testator being afflicted with an insane delusion. One doctor testified that he treated the testator as one would treat a child, and, although he believed that testator was sane, he described him as "mean as hell". Another doctor, who qualified as a psychiatrist, testified that testator had a fixed delusion from which he was never relieved and which probably existed to the time of his death. The doctor further testified that this delusion went back to the time he was living with the appellants and never got better, but got progressively worse. The doctor stated that he believed that the testator's persecution and paranoid thinking started during the winter of 1964. There is other testimony in the record from lay witnesses, both pro and con, as to the testator's behavior.

■ Now, bearing in mind the conflicting testimony of both laymen and doctors, and the voluminous testimony in the record as to the existence or non-existence of an insane delusion suffered by the testator, it it readily apparent that there was a hotly contested point as to whether such delusion did exist and, if so, whether it influenced him in making the will which the court admitted to probate. His attorney testified that testator appeared perfectly normal to him while he was making out the will, but this is in contradiction with the testimony of the pyschiatrist, who said he had had this delusion ever since the winter of 1964. Therefore, we are confronted with a factual situation that needed to be determined by the trial court; but for some reason the trial court did not submit the issue of "insane delusion" to the jury, although, in his charge, he instructed the jury that in order to make a valid will, the person making same must have testamentary capacity and must not, at the time of the execution of the will, be laboring under an insane delusion which influenced the person executing the will to dispose of his property in a way which he would not have done but for the insane delusion. The court then went on and defined the term "testamentary capacity" and the term "insane delusion". Therefore, we have a situation where, although the record is full of argument and testimony as to whether or not the testator suffered from an insane delusion, and the jury had instruction from the judge that the non-existence of an insane delusion is one of two essential ingredients to a valid will, the matter of insane delusion was never submitted to the jury and stands judicially undetermined at this time. This creates rather a paradoxical situation; in other words, that a jury *could* find that a testator had an insane delusion when he made and executed a will, but could still make a valid will. This is contrary to the first line of the quoted portion of the court's charge, and we think is fatal to the judgment. It will be noted that in his definition of "testamentary capacity" the court makes no reference whatever to "insane delusion". Therefore, the answer of the jury to the effect that testator did have testamentary capacity did not relate in any way to the absence or presence of an "insane delusion". The appellant-contestants objected to the form of the charge and requested an instruction on the matter of insane delusion, which the court refused to give. The appellants also requested a separate issue on "insane delusion", which the court also refused to submit.

Appellants' first three points charge that the court erred in submitting Special Issue

No. 1 only in the form that it was submitted because the instructions given along with the issue failed to charge the jury that a person laboring under an insane delusion does not have testamentary capacity. Appellants' Points 2 and 3 charge the court with error in its refusal to submit appellants' requested instruction and requested special issue.

In considering the matter before us, it must be borne in mind that we are not actually dealing here with the validity of the will, but rather the testamentary capacity of the testator. In other words, a person with complete testamentary capacity in every respect can make and execute a will that proves to be invalid, but a person who does not possess testamentary capacity at the time of the making of his will cannot make a valid will. Insane delusion is usually used as a ground of attack against the testamentary capacity of the testator. Here, the judge specifically set forth two essential elements for the making of a valid will and, although there is a wealth of testimony on it, he did not submit the matter of insane delusion, either in his definition of testamentary capacity or by direct issue to the jury. There is certainly substantial suggestion in the Statement of Facts that the testator may have been under an insane delusion at the time he made the will in favor of appellee. The real vice in these matters is want of capacity. In Rodgers v. Fleming, 3 S.W. 2d 77 (Tex.Com.App.1928), the court submitted a definition of "testamentary capacity" which made no mention of insane delusion. The contestants in that case requested a special charge. The court held that because the question of insane delusion was raised by the evidence, it was reversible error to refuse the contestants' requested instruction pertaining thereto. In Lindley v. Lindley, 384 S.W.2d 676 (Tex.Sup.Ct. 1964), the Supreme Court held that where the evidence properly raises the issue of insane delusion, the contestants in said will are entitled to have an instruction on insane delusion. In this, the Lindley case, it will be noted, also, that the trial court submitted a definition of testamentary capacity, but made no mention of insane delusion. Both cases seem comparable to and decisive of the matter before us. If anything, the matter in controversy here is even more serious than that in the two cases cited, supra, because in the present case the trial judge specifically set out that a will, to be valid, must be devoid of any insane delusions affecting the terms of the will at the time of its execution. The record shows that the testator apparently didn't trust anybody, felt the Greens were trying to kill him, became unhappy with the situation at appellee's home, and eventually shot appellee and her friend and then himself. It must also be remembered in this connection that the doctor qualifying as a psychiatrist testified that the insane delusion began to manifest itself in testator in the winter of 1964 and got progressively worse.

For these reasons we believe the appellants' first three points must be, and they are, sustained.

Appellants' fourth point charges that the court erred in the submission of Special Issue No. 1 because the question as submitted called for an answer which improperly placed the burden of proof. We do not find reversible error in this point, and it is therefore overruled.

Appellants' fifth point charges that the court erred in failing to submit appellant-contestants' requested Special Issue No. 2, on undue influence. We do not find that the record requires the submission of such issue, and therefore hold that this point does not contain sufficient merit for consideration. It is accordingly overruled.

Because we believe that the trial court erred in his manner of submission of this case to the jury, appellants' first three points are sustained and the judgment of the trial court is reversed and the cause remanded.