IN THE 
COURT OF CRIMINAL APPEALS
OF TEXAS





NO. PD-1388-04


 

RICHARD VELA, JR., 
Appellant

v.

THE STATE OF TEXAS



ON STATE'S PETITION FOR DISCRETIONARY 
REVIEW
FROM THE THIRTEENTH COURT OF 
APPEALS
NUECES COUNTY


Cochran, J., filed a concurring opinion, 
in which Johnson, J., joined. 

O P 
I N I O N 

I join the 
majority opinion. I add these comments only to emphasize that when an expert 
offers an opinion which is so outside the general mainstream of a particular 
scientific field as to be extraordinary, the proponent of that expertise must 
provide a greater-than-usual foundation for its reliability.
In this case, the 
complainant, J.S., testified that she started dating appellant while she was 
estranged from her husband. She moved into his garage apartment. Appellant owed 
people a lot of money, and he was frequently angry. On August 25th, appellant 
was drinking heavily and got angry at J.S. He told her that he needed to teach 
her a lesson "in respect." He said that she was a whore, and if she wanted to be 
treated like a whore, he would do so. According to J.S., that is when the sexual 
assault started. 
Appellant grabbed 
her by the hair, pushed her down on the couch, and tried to force her to perform 
oral sex on him. He slapped her, turned her over, pulled down her pants and 
began to anally rape her. J.S. said she 

 was crying and 
 I told him to stop and I said, "You're hurting me. Why are you doing this?" 
 And he wouldn't stop, and then he- he raped me vaginally, and then he stopped 
 and he said- he said, "I'm so mad," he said, "I can't even finish." He said, 
 "I'm so mad at you." And then he took his- he took his belt off from his pants 
 and he started beating me with it across my legs and I tried to turn around 
 and I was, you know, blocking myself and then he hit me in the butt and the 
 legs.
J.S. repeatedly 
testified that she did not then agree, and never before had agreed, to have anal 
sex with appellant. She said that she did not agree to have vaginal or oral sex 
with him on this occasion, although she had agreed to do so on prior occasions, 
under different circumstances. 
When J.S. went 
into the bathroom after the incident, she was bleeding profusely from the anus. 
Appellant came into the bathroom and told her that he had done this to teach her 
a lesson about respect. He said, "And if you act up anymore, next time I'll tear 
you from one end to the other." She was in shock. She went into the bedroom and 
cried until she fell asleep.
The next morning, 
appellant woke her up and said, "Bitch, get up and go make me some breakfast." 
J.S. was scared, but obeyed, all the while planning to "buy some time" and then 
leave. Two days later, appellant got mad at J.S. again- "he went crazy"- and 
started to choke her. She tried to call 911, but appellant pulled the phone out 
of the wall. As appellant stepped outside to block J.S. from running away, she 
closed the door on him and locked him out. He then came around to the back of 
the apartment to climb through a window, so she ran out the front door and 
escaped, banging on people's doors for help.
Some neighbors 
allowed her to use the phone, and she called the police. When the police 
arrived, they took her back to the apartment where appellant was already in 
custody. She told the police about the physical assault, but not about the 
sexual assault two days earlier because she was ashamed and embarrassed. She 
asked the officers to drive her to her estranged husband's home. Once there, she 
told her husband about appellant's sexual assault two days earlier and he took 
her to the hospital the next morning.
Although it was 
three days after the sexual assault, a S.A.N.E. nurse, Sonia Eddleman, examined 
J.S., noting an "oozing" anal tear, purple and yellow bruises on her left 
breast, left hip, left thigh, and left buttocks, as well as scrapes on her right 
buttocks. Nurse Eddleman said that J.S. did not have any other genital 
injuries.
After the State 
rested, appellant called his expert witness, Nurse Cheryl Hartzendorf, outside 
the presence of the jury, on a Daubert 
(1) hearing. Nurse Hartzendorf testified that she had examined J.S.'s 
medical records and found that the "rape kit" materials, gathered more than two 
days after the incident, did not uncover any sperm or fingernail scrapings that 
linked appellant to J.S. From these physical findings, she concluded that no 
sexual assault had occurred. She said that she was testifying pro bono because 
she saw "a right that needs to be wronged": 
(2)

 There is no 
 evidence to indicate that this particular person, no sperm, no head hair 
 combings, no vaginal swabs, fingernail swabs, oral smears, vaginal smears, 
 anal smears that- there's no DNA evidence linking this particular-Mr. Vela to 
 the alleged rape of [J.S.]. . . . I think it is consensual 
sex.
There may well be 
a scientifically reliable basis for this opinion, but if so, the basis for that 
opinion is nowhere in this record. Of course, Nurse Hartzendorf was certainly 
qualified to testify to the absence of vaginal trauma, and to the lack of other 
physical evidence linking appellant to the complainant. 
(3) However, there is nothing at all in the record that supports any 
scientific connection between the absence of vaginal trauma and the conclusion 
that therefore any sexual encounter was consensual. Nor is there any explanation 
for concluding that this encounter was "consensual sex" from the fact that there 
was no DNA evidence linking appellant to the vaginal swabs taken from J.S. DNA 
evidence usually indicates ejaculation of sperm or the presence of some human 
portion of anatomy. The record contains no scientific support for an opinion 
that a lack of DNA evidence indicates consensual sex.
Here, Nurse 
Hartzendorf admitted that she had not consulted any scientific articles, nor was 
she aware of any that supported her hypothesis. She agreed that hers was not a 
widely accepted belief with persons in her profession. The defense reiterated 
that she was a nurse and had testified "in cases like this" once before. 
Therefore, she was qualified to express this particular opinion in this 
particular case without any further foundational showing of scientific 
reliability. When questioned by the trial court, Nurse Hartzendorf 
stated:

 According to 
 the medical records, there's no trauma to this particular client that she's 
 claiming to of the neck bruising and- or fingerprints. According to the 
 medical records of Christus Spohn Memorial or Doctor's Regional or Ms. 
 Eddleman's report, it's not indicated that there is any marks around the - 
 [J.S.'s] neck. There is no evidence that was collected in terms of hair 
 samples, sperm, wet mounts, vaginal swabs or anything that indicate there was 
 any evidence linking this particular client to the rape, alleged 
 rape.
After thanking 
the witness, listening to the arguments of counsel, hearing Ms. Eddleman testify 
that she had never heard of this theory or of any scientific articles or other 
experts that supported the defense expert's position, the trial court sustained 
the State's objection to Nurse Hartzendorf's testimony.
Appellate courts 
must examine the trial court's Daubert ruling 
within the context of the specific factual situation, the specific "fit" between 
those facts and the expert's opinion, the expert's qualifications concerning the 
specific area of proffered testimony, and the scientific basis for any proposed 
expert opinion. Although the general theory of "no rape if no physical trauma or 
physical findings" may have a scientific basis, it is such a scientifically 
unusual theory that a trial court would not abuse its discretion in excluding 
testimony about such a theory unless the expert provided ample scientific 
documentation to support its reliability and applicability in a situation such 
as the present one.
Furthermore, the 
defense made no showing that Nurse Hartzendorf was aware of controlling Texas 
law concerning sexual assault. 
(4) Unless an expert is using the same legal standards as the jury 
must use, he cannot give his opinion on a legal term because his opinion would 
be of no assistance to the jury. 
(5) First, of course, Texas law does not require ejaculation, only 
penetration, for a sexual assault. 
(6) Second, Texas law does not require the use of physical force; 
sexual assault occurs when a person penetrates the sexual organ of another 
without that person's consent. 
(7) Further, even a layman might conclude that recovering physical 
evidence from a sexual assault that had occurred more than two days earlier 
might be a difficult proposition if the complainant had performed normal 
hygiene. 
With these 
comments, I join the majority.
Filed: December 
13, 2006
Publish
 
 

1. Daubert v. Merrell Dow 
Pharm., 509 U.S. 579, 593 (1993); see also Nenno v. 
State, 970 S.W.2d 549, 560-62 (Tex. Crim. App. 1998); Kelly v. State, 
824 S.W.2d 568 (Tex. Crim. App. 1992). 
2. Perhaps this statement is a word-sized spoonerism. 
3. The State's expert had already testified to these facts. 
The defense offered Nurse Hartzendorf's testimony solely for her ultimate 
opinion that if there is no physical evidence, there is no rape. 
4. See Tex. Penal 
Code § 22.011. 
5. See, e.g., 
Lum 
v. State, 903 S.W.2d 365, 370 (Tex. App.-Texarkana 
1995, pet ref'd) (holding that a witness's testimony regarding whether the 
defendant behaved negligently was properly excluded because the witness was "not 
shown to be an expert on negligence or to know the legal definition or standard 
of negligence"); see also Lindley v. 
Lindley, 384 S.W.2d 676, 682 (Tex. 1964) (stating that "a doctor's concept 
of what constitutes an insane delusion may be quite different from the legal 
concept"). 
6. Id. § 
22.011(a)(1)(A) ("A person commits an offense if the person intentionally or 
knowingly causes the penetration of the anus or sexual organ of another person, 
without that person's consent"). 
7. Id.