**In the Matter of the ESTATE of M. L. WOODS, Deceased.**

**No. 4829.**

Court of Civil Appeals of Texas, Eastland.

Nov. 14, 1975.

Rehearing Denied Feb. 5, 1976.

Dewey C. Cox, Jr., Ranger, C. O. McMillan, Stephenville, for appellant.

Bill B. Hart, Eastland, for appellee.

WALTER, Justice.

This is a will contest case. M. L. Woods died May 8, 1973. He was ninety-one or ninety-two at the time of his death. His will dated August 7, 1964, with codicil dated May 16, 1972, was admitted to probate. Thereafter, Orville Lucille Woods Brown filed suit to set it aside which was denied. On appeal to the District Court, judgment was rendered setting aside and cancelling the judgment of the probate court which admitted Mr. Woods' will to probate.

Fred McCright, independent executor of the Estate of M. L. Woods, Deceased, Owen

E. Rose, Robert Stephenson, Carolyn L. Braddock, Neita Faye Rose Melton, Johnnie Owen Rose, and Shirley Ann Rose, hereinafter referred to as proponents, have appealed.

The jury found at the time Woods executed his will and codicil he was acting under undue influence and at the time of executing the codicil of May 16, 1972, he was not of sound mind.

The proponents contend there is no evidence to support the jury's answers. They also contend the court erred in admitting the testimony of Mrs. Euna Woods and Maureen Bratton.

To determine the question of whether there is any evidence of probative force to support the jury's findings we must follow the principle of law announced in *Martinez v. Delta Brands, Inc.*, 515 S.W.2d 263 (Tex. 1974), wherein the court said:

> "When a party asserts that there is no evidence to support jury findings, we must review the evidence in its most favorable light, considering only the evidence and inferences which support the findings, and rejecting the evidence and inferences contrary to the findings. *Butler v. Hanson*, 455 S.W.2d 942 (Tex.1970); *Langlotz v. Citizens Fidelity Insurance Company*, 505 S.W.2d 249 (Tex.1974). It would be our duty to affirm the judgment of the Court of Civil Appeals if the evidence offered to show negligence were proven to be no more than a scintilla of proof. Thus if the evidence created nothing more than a mere surmise or suspicion of the existence of negligence, such evidence would be, in legal effect, no evidence. *Joske v. Irvine*, 91 Tex. 574, 44 S.W. 1059 (1898). But if negligence may be reasonably inferred from direct evidence, then there is more than a scintilla of evidence. Calvert, 'No Evidence' and 'Insufficient Evidence' Points of Error, 38 Texas Law Review 361, 363 (1960)."

In *Pearce v. Cross*, 414 S.W.2d 457 (Tex. 1966), at page 458 our Supreme Court sets forth the elements of undue influence as follows:

> " . . . The correct rule with respect to declarations of the testator in undue influence cases is succinctly summarized in McCormick & Ray, Texas Law of Evidence, § 894 (2d ed. 1956), as follows:
>
> > Undue influence as an invalidating fact consists of two elements: first, the external, the words or acts of third persons which bring the pressure to bear; second, the internal, the collapse of the testator's own will, produced by such external conduct. It is held that declarations of the testator, of whatever type, are no evidence of the former but only of the latter elements.
>
> We reaffirmed the rule as recently as 1964. See *Lindley v. Lindley*, 384 S.W.2d 676, 682 (Tex.Sup.1964)."

■ Every case of undue influence must be decided on its own peculiar facts. *Rothermel v. Duncan*, 369 S.W.2d 917 (Tex.1963). Undue influence may be established by circumstantial as well as direct evidence. "Undue influence is usually a subtle thing, and by its very nature it usually involves an extended course of dealings and circumstances." *Rothermel v. Duncan*, supra.

■ The evidence shows Mr. Woods was old, hard of hearing, could not see well and had a back injury. This evidence may be considered as establishing Mr. Woods' physical incapacity to resist or the susceptibility of his mind to an influence exerted. *Rothermel v. Duncan*, supra.

■ By his will dated March 21, 1962, Morris L. Woods appointed W. H. Cooper his independent executor and left all his property to Orville Lucille Woods Brown and Susie M. Bratton.

Thereafter on August 7, 1964, he executed another will revoking the 1962 will. In his 1964 will, he devised to Owen E. Rose and Beatrice L. Rose the surface only to approximately 300 acres of land subject to a life estate which he devised to Robert Stephenson.

He devised the surface to other land which he owned to Carolyn L. Braddock, Neita Faye Rose, Johnnie Owen Rose, Shirley Ann Rose and Susie Maureen Bratton. The rest and residue of his estate was left to Owen E. Rose, Beatrice L. Rose, Carolyn L. Braddock, Neita Faye Rose, Johnnie Owen Rose, Shirley Ann Rose, and Susie Maureen Bratton, share and share alike.

On May 16, 1972, Mr. Woods executed a codicil excluding Susie Maureen Bratton from his will and leaving her one dollar.

Maureen Bratton testified substantially as follows:

> I have known Morris Woods since I was nineteen years of age and I am fifty-two now. So I guess I have known him for about thirty-three years. I worked for him for about sixteen years beginning in 1956. His wife was living when I started working for him but she died in 1962. After Mrs. Woods passed away, Morris asked me if I would move down to his place. I had my grandchildren with me then and he built a room for them. Owen Rose is my brother. He asked me if I would get him a job with Mr. Woods. This was about 1963. He wasn't living here in 1956 when I started working for Mr. Woods. He was living in Lufkin and he did not know Mr. Woods until after I talked to Morris about hiring him to go to work. I had been helping Morris doctor cattle and brand them so after he hired my brother, Owen, that was the job he started doing. He started to work for Mr. Woods and worked for him up until Mr. Woods' death. I continued to work except for the last year before Mr. Woods' death because:

>> "Owen Rose and his family moved my furniture out down there, moved it into a store room, and I didn't have a place to stay."

> I continued to work for Morris until January or February of 1972. Morris came down to my house in 1962 and told me that he had made a will and had named Lucille Brown and me his beneficiaries.

This is the will dated in 1962. He told me that W. H. Cooper was his executor. He and Mr. Cooper had been friends for many years. Later on Morris talked to me about another will. He asked me to find out about a will or some papers that he had signed and he wasn't sure which it was or what the contents were.

She was asked the following questions and she gave the following answers:

> "Q All right, did you attempt to find out what it was?
>
> A Yes sir, he told me, he said, 'I either signed a will or some papers', and he said, 'Maureen, I don't know what was in them', and he said, 'I want you to go and find out for me', and so I asked him where they were at, and he said Owen Rose had them at his home, and I went up there and asked my brother and my sister-in-law, she was there, and I asked him about it, and he said, 'aw, hell, Mr. Woods is sick, and I'm not going to fool with that damn thing, he might as well hush.'
>
> Q Who said that?
>
> A Mr. Rose told me that.
>
> Q Owen Rose?
>
> A Yes."

> I went back to the house and told Morris that my brother wouldn't let me have the will. I would say this was along in 1964 or 1965, around that date.

She was asked the following questions and she gave the following answers:

> "Q All right, and what did he ask you to do?
>
> A Well, he asked me to go to my brother's and ask him if I could get the will and bring it back down there and read it to him, that he wanted to know what was in it. But my brother failed to let me have it, and like I say, he kind of give me a cussing and just almost ordered me out of the house, and told me, said, 'hell, Mr. Woods is sick and you're damn sure not getting this will.'

Q  And Mr. Rose that that will, as far as you know, in his possession?

A  Yes sir."

"Q  All right, did you hear their conversation between Morris Woods and Owen Rose?

A  Yes, I sure did.

Q  All right, what did you hear?

A  I heard my brother say, 'Now, Morris, I'm not going to have a damn thing to do with that anymore, anything else to do with it, with the will'. He said, 'my kids will be mad at me', and he said, 'By God, I'll just quit.' "

Mrs. Euna Woods testified substantially as follows:

I am Mrs. H. O. Woods, Sr. Morris L. Woods was my husband's brother and he married my aunt. Morris' wife died several years ago and Morris had no children. I believe Morris was ninety-one or ninety-two years old when he died. I don't know what was wrong with him but he had been sick for a good long time. He died at his home about three weeks after he left the hospital. I tried to visit him several times in the hospital but the Rose family never would let us go in and talk with him without some of the family in the room with us. One time while I was in the hospital the Rose family was called out of the room and Morris called me to his bed and said he wanted to talk to me.

Morris Woods came to me two or three times and asked me to let him talk to me about something and he said, "you are the only one in the family that I can talk to and discuss anything and get a little bit of sense out of it". He made that statement to me several times. I had an occasion to be around Morris in 1963 and 1964. We ran a grocery store and he traded with us and he was up there two or three times a week. I talked to him quite often. During 1963 and 1964 my husband and I would drive to his ranch on Saturday and Sunday afternoon and talk to him. Sometimes he would know

us and sometimes we would have to tell him who we were. He couldn't see unless you were right up close to him, and he couldn't read nor write but he was able to print his name. I have talked to Morris after he wrote the 1962 will and before he wrote the 1964 will. He came to our grocery store and asked me if he could talk to me. He said, "Well, I don't know if you know about it or not but I had a will drawn up yesterday." Morris said he left one-half of his property to Lucille (Lucille is Mrs. H. O. Woods' daughter) and one-half to Maureen Bratton. He said Maureen had worked for him a long time and she took good care of him and she helped take care of Mrs. Woods while she was sick. He said I want to tell you that as long as I've got my sound mind there'll never be a change made in that will. He said if anybody ever comes up with another will, I want you to fight it as long as you have any breath. I asked him what I could do about it and he said, "Well, I always thought you were a fighter." He said he wanted Lucille to get the 160 acre home place because that's the land his father gave him before he died. I want Lucille to have that and I'm going to have it fixed to where she can never sell it and if anything happens to her, her daughter Elizabeth will get it and if anything happens to her, her little girl will get it and that goes on down as far as Lucille's family goes. It will stay in the Woods name as long as one of them are still living. Another reason I want the property to stay in the Woods family is because of Orville. He said Orville (Orville is the witness' husband) and I have always been real close. He comes down and fishes and hunts on my place and I want to keep it that way so he and the boys can always feel free to come down here and make their home here hunting and fishing. Sometime Orville and me and Lucille would drive down to his place on Saturday and Sunday afternoon and if we had cooked a pie or cake, we would take it to him.

About three weeks prior to Morris' death, I had a conversation with him at the hospital.

And the witness gave the following answer:

"A Well, he just told me, he said, 'they tell me I signed some papers, and I tried to get them to bring them and let somebody read them to me, so I'd know what I'd signed, and they would not do it', he said, 'I never did know what I signed'. He said, 'I couldn't read, and I just signed what they told me to'. He said, 'I never did know what I signed.'"

After Morris got sick, we didn't get to visit with him much. Mr. and Mrs. Rose and Mrs. Norton stayed with him. Orville and me offered to stay with him and the Rose family said there's plenty of us and we don't need anybody to help us.

From the date of the 1962 will until Mr. Woods' death on May 8, 1973, there had been no change in the relationship between Mr. Woods and Orville Lucille Woods Brown and Maureen Bratton, the beneficiaries in the 1962 will. The 1962 will was prepared by his regular attorney at Ranger, Texas. There is evidence that the attorney who drew the 1964 will and the 1972 codicil had never done any legal work for him before and he was from Eastland, Texas.

We cannot say the jury was unauthorized reasonably to infer that Mr. Rose exercised undue influence on Morris Woods which caused him to execute the 1964 will in which he and his family were the principal beneficiaries. This inference could reasonably have been reached from direct evidence of Mr. Woods' deep affection for Orville Lucille Brown and Maureen Bratton which continued until his death. An inference could reasonably have been reached from direct evidence that Owen Rose refused to permit his sister to read the will and telling her, "hell, Mr. Woods is sick and you're damn sure not getting this will".

Another inference could reasonably have been reached from direct evidence that Owen Rose did not know Morris Woods until his sister talked to Mr. Woods about hiring him to work on the ranch in 1963.

We hold the above testimony and other facts and circumstances in evidence constitutes some evidence of probative value and support the verdict of the jury. *Pearce v. Cross*, 414 S.W.2d 457 (Tex.1966).

Appellants contend the Court erred in admitting some of the testimony of the witnesses, Mrs. Euna Woods and Maureen Bratton, concerning declarations which M. L. Woods made to them. These declarations of the deceased that the witnesses testified about were offered not for the purpose of proving the truth of the statements but only to show the testator's state of mind, after the undue influence had been established by other competent circumstantial evidence. The court did not err in admitting this testimony.

We have considered all of appellants' points and find no merit in them. They are overruled.

The judgment is affirmed.

## ON MOTION FOR REHEARING

Appellants contend in their motion for rehearing we erred in overruling their fifth point of error, "The evidence is insufficient to support the verdict of the jury."

They assert this point is germane to assignments of error numbers one and three in their motion for a new trial. Assignment of error number one asserts there is no evidence that Woods acted under undue influence at the time he executed the will and the codicils and no evidence he was of unsound mind. Assignment number three contends the Court erred in overruling their motion for a directed verdict. Appellants now contend their fifth point of error presents a point on the factual sufficiency of the evidence. These assignments do not raise questions as to the factual sufficiency of the evidence. They present only "no evidence" contentions. A factually insufficient point cannot be predicated on these

assignments. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965).

The motion for rehearing is overruled.