**NAVARRO et al. v. RODRIGUEZ.**
**In re WILLIS' ESTATE.**

No. 12200.

Court of Civil Appeals of Texas.
San Antonio.

Dec. 13, 1950.

Rehearing Denied Jan. 10, 1951.

Leonard Brown, Archie S. Brown, San Antonio, for appellants.

Clifton & Tynan, San Antonio, for appellee.

NORVELL, Justice.

Arnold J. Rodriguez filed an application for the probate of the last will and testament of Margaret Willis, deceased. The will appointed him as executor and named his mother, Mary Moglia Rodriguez, as beneficiary. This application was contested by Adela Navarro and Antonia Martinez Rodriguez, the sister and mother of the deceased. The will was admitted to probate by the county court, and an appeal was taken to the district court where judgment was rendered in favor of contestee

upon the jury's finding that Margaret Willis possessed testamentary capacity at the time the will was executed.

By their first point contestants assert that the trial court should have given a special instruction relating to insane delusions, and that the usual submission of the issue of testamentary capacity employed in this case was insufficient in view of the facts disclosed by the record. By their second point contestants assert that the trial court erred in refusing to submit an issue of undue influence to the jury.

In order to dispose of these contentions it is necessary to examine the family background of the people involved, as well as the immediate circumstance attendant upon the execution of the disputed will. In 1910, Antonia Martinez Rodriguez resided at 1116 North Colorado Street, San Antonio, Texas. She was the mother of five children. Her husband and one of the sons died prior to 1910, and some years thereafter another son was burned to death. The remaining children were Jesus, who died on February 28, 1949, Adela Rodriguez Navarro, one of the contestants, and Margaret Willis, the testatrix.

Jesus married Mary Moglia in 1910. He and his wife lived with his mother at 1116 North Colorado Street and reared a family. The house upon the premises was too small to meet his increasing needs and new rooms were added to the structure. A lien was placed against the property and the indebtedness secured thereby was discharged by Jesus Rodriguez, and his mother thereupon gave him a deed to the property. However, she continued to reside upon the premises until shortly before the death of Margaret Wills in 1949. The daughter Adela (a contestant) married and for some time lived in the State of New Jersey. Margaret (the testatrix) likewise married but had no children. She secured a divorce from her husband and apparently made her own living. She resided in Laredo for a number of years doing clerical work. Mrs. Willis eventually acquired a home of her own at 1244 West Russel Place, San Antonio, a few town lots in Laredo and a small tract of land near Carrizo

Springs, Texas. While the chief burden of caring for the mother fell upon Jesus and his wife, the daughters, from time to time, sent money to help care for their mother. The mother in turn, as long as she was able to do so (until about fifteen years ago) helped around the house and assisted in rearing and caring for her son's children. The family seemed to function harmoniously as a unit until the year 1949. One witness described the family as "being a close family, and what hurt one hurt another, and they helped each other always."

There is some conflict in the testimony as to certain occurrences which took place about the time of Jesus' death. Mrs. Adela Rodriguez Navarro returned from New Jersey and eventually secured a place in the country near San Antonio, where she lived with her son. After the death of Jesus, the condition of Mrs. Margaret Rodriguez Willis became serious, and for certain periods the mother, Antonia Martinez Rodriguez, lived with her daughter Adela. According to Mary Moglia Rodriguez, the mother did not finally remove her residence from North Colorado Street until about two weeks prior to the death of Mrs. Willis. Mrs. Navarro testified she had returned from New Jersey because her sister, Margaret, had requested her to do so, in view of the approaching death of the brother, Jesus, and the poor physical condition of Mrs. Willis who was suffering from leukemia, from which disease she ultimately died. Also, according to Mrs. Navarro, it was understood that after her brother's death she would take care of her aged mother and that Jesus' widow, Mary Moglia Rodriguez, would take care of Mrs. Willis. For a few weeks prior to her death, Mrs. Willis lived with her sister-in-law in the Colorado Street residence.

On November 24, 1937, Mrs. Willis executed an instrument purporting to be a will, in which she named her brother Jesus as the sole beneficiary and appointed him independent executor of her estate. On July 4, 1949, two days prior to her death, Mrs. Willis dictated a memorandum to her nephew Arnold Rodriguez and told him to

secure the services of a lawyer and have a proper will prepared. Rodriguez requested Mr. Victor E. Koenning to prepare the will. Koenning prepared the instrument, took it to the house where Mrs. Willis was staying, read it over to her in its entirety and discussed it with her. He and Adolfo J. Garcia signed the will as attesting witnesses.

Dr. R. E. Bowen, Mrs. Willis' attending physician, testified that he saw Mrs. Willis the day the will was executed; that she discussed the matter of making a will with him, and that he, with three others, signed the memorandum which Mrs. Willis dictated to Arnold Rodriguez. According to the doctor, Mrs. Willis was alert and her mind was clear at that time, although physically she was very weak. He testified that Mrs. Willis was not insane and that he did not know of a case of leukemia in which the mind was affected. However, Dr. Bowen's testimony forms the basis of the contention that an instruction as to insane delusions should have been given. He testified as follows: "Q. Did you know of any incident where she (Mrs. Willis) became offended at Mrs. Navarro? A. About a month or so before she died I was there one morning and she was on the divan, and she said she was so weak she couldn't get up. I asked her where her sister was and she said, 'Well, she went home.' I said, 'You better get somebody over here to stay with you.' And the next morning she told me her sister went home to feed the dogs and cats, and that is about all she told me about it."

Arnold Rodriguez also testified as to this occurrence. Mrs. Willis stated to him that Mrs. Navarro's son had come to the house and talked to his mother, whereupon Mrs. Navarro left Mrs. Willis and stated (according to Mrs. Willis) that she had to go home and feed the cats and dogs.

Mrs. Navarro testified that no such occurrence as that related by Mrs. Willis had ever taken place, and that although she had brought two dogs back with her from New Jersey, her son took care of them and fed them.

■ The authority relied upon as supporting contestants' position that a special instruction as to insane delusions should have been given is the leading case of Rodgers v. Fleming, 3 S.W.2d 77, by the Commission of Appeals, holdings approved by the Supreme Court. We think that a reading of the opinion in the case cited demonstrates that it is clearly distinguishable from the case before us. From said opinion it appears that evidence was introduced indicating that the testator, W. J. McDonald, believed his nephew, Dr. Will McDonald, was going to kill him for his property and consequently he carried a pistol to protect himself from his nephew; that he believed that Mrs. Charley McDonald, the wife of a relative, was an unscrupulous and designing woman who had stolen tablecloths and other things, and that he also believed that Mrs. Henry McDonald, who looked after his food, was the meanest woman in the world and mean as hell. There was further testimony that W. J. McDonald entertained other false and unfounded beliefs which were stated in a hypothetical question set out in the opinion in the case. 3 S.W.2d 81-84. The evidence in Rodgers v. Fleming went far beyond anything contained in the record now before us and if credited clearly indicated a disordered and diseased mind. In the present case there is nothing more than the suggestion of a misunderstanding or a mistake of fact, or an illogical conclusion. If an instruction as to insane delusions be required by the evidence in this case, then such an instruction would have to be given in most all will contest cases, as it would not be difficult to produce evidence that a testator harbored some mistaken ideas or erroneous beliefs. Even rational human beings are subject to mistake, prejudice and ill-founded conclusions. "A delusion, to deprive the testator of capacity, must be an *insane* delusion. An insane delusion such as will affect testamentary capacity is an idea or belief which has no basis in fact or reason and to which the testator adheres against reason and evidence, or, in other words,

it may be stated to be a belief in a state of facts that does not exist and which no rational person would believe to exist. A mere mistaken belief or an erroneous or unjust conclusion is not an insane delusion if there is some foundation in fact or some basis on which the mental operation of the testator may rest, even though the basis may be regarded by others as wholly insufficient." 68 C.J. 433, Wills, § 30.

We are of the opinion that the trial judge did not err in refusing to submit an issue relating to "undue influence." It is well settled that proof of opportunity is not in itself sufficient to make out a case of undue influence. Walter v. Goeth, Tex.Civ.App., 177 S.W.2d 794. In Long v. Long, 133 Tex. 96, 125 S.W.2d 1034, relied upon by appellants, in addition to proof of opportunity, it was shown that Frank O. Long, who was charged with the exercise of undue influence, had for a number of years generally looked after and supervised most of the business affairs and business interests of his mother, the testatrix, and that she entered into few business ventures without consulting her son. That type of proof was lacking in this case. It is shown that Mrs. Willis discussed the matter of making a will with a number of apparently disinterested persons, whose testimony cannot be disregarded. Four such witnesses signed the memorandum which she dictated in their presence. Arnold Rodriguez took this memorandum to a lawyer, but there is no evidence that this was done at his suggestion or insistence. It appears that Mrs. Willis had, prior to her brother's death, attempted to make a will leaving all her property to him, because he had borne the main burden in caring for their mother. It cannot be said that the will leaving the property to her brother's widow was necessarily an unnatural one. "Undue influence refers to the freedom of the mind of the maker of a will. Influence to be undue must, to a certain extent at least, destroy the free agency of the testator, and prevent the exercise of the discretion required by law in connection with the

testamentary disposition of property." Smith v. Mann, Tex.Civ.App., 296 S.W. 613, 615; 44 Tex.Jur. 562, Wills, § 20. We hold that the evidence does not raise an issue of undue influence. Appellants' second point is overruled.

Appellants' third point in substance again raises the question of testamentary capacity. The will finally executed by Mrs. Willis with the formalties required by law differs in detail from the memorandum dictated by her to Arnold Rodriguez. The will provided that the devise to Mary Moglia Rodriguez was "with the understanding that in the event of the death of my sister, Adela Navarro, with whom my mother now resides, that said Mrs. Mary Moglia Rodriguez as my sole beneficiary shall again take (care) of my mother during the rest of mother's life."

The memorandum provided that the property should be left to Mary Moglia Rodriguez, "with this proviso which is in love and confidence that my mother will never be neglected as long as she lives."

The jury found that Mrs. Willis had testamentary capacity to execute a will. It was shown that she did so in conformity with statutory provisions. As a matter of law, the provisions of the executed will control over those of the preliminary memorandum. Appellants' third point is overruled.

The trial court did not err in receiving the testimony of the witness John A. Bertetti to the effect that, in his opinion, Mrs. Willis was a person of sound mind. This witness testified that he had known the testatrix for about twenty-five years; that he was called to witness her will, but arrived after the same had been signed in the presence of other witnesses; that Mrs. Willis discussed the provisions of the will with him; and that in his opinion she was in full possession of her mental faculties on the day the will was executed. Appellants' fourth point is overruled. 44 Tex. Jur. 583, Wills, § 41.

No reversible error being shown, the judgment appealed from is affirmed.