

# IN THE
# TENTH COURT OF APPEALS

_____

## No. 10-14-00319-CV

**JAMES L. JANES, SAM BRITTON PYLAND, JR.
AS INDEPENDENT EXECUTOR OF THE ESTATE
OF LUCY PYLAND, DECEASED, AND DENNIS
SPENCE JANES AS INDEPENDENT EXECUTOR
OF THE ESTATE OF WOODROW WILSON
JANES, DECEASED,**

                                                                **Appellants**

 **v.**

**MARY ADAMS AS INDEPENDENT EXECUTOR
OF THE ESTATE OF BETTIE MAXEY, DECEASED,**

                                                                **Appellee**

_____

**From the County Court
Falls County, Texas
Trial Court No. 8305**

_____

## MEMORANDUM OPINION

_____

James L. Janes, Sam Britton Pyland, Jr. as Independent Executor of the Estate of

Lucy Pyland, Deceased, and Dennis Spence Janes as Independent Executor of the Estate

of Woodrow Wilson Janes, Deceased appeal from a denial of their contest of the will of

Bettie Maxey, who had passed away in 2011. The appellants complain that the evidence

was legally and factually insufficient for the trial court to have found that Maxey was not suffering from an insane delusion at the time she executed her will, factually insufficient for the trial court to have found that there was no undue influence, and factually insufficient for the trial court to have found that the will was not procured by fraud. Because we find that the evidence was sufficient to support the trial court's judgment, we affirm the judgment of the trial court.

*Background Facts*

Bettie Maxey had five siblings: James L. Janes, Lucy Pyland, Woodrow Wilson Janes, Donnie Janes, and Mary Adams. Maxey had been married but her husband passed away in 1996. Maxey did not have any children.

During their marriage, Maxey and her husband bought a 1,000 acre tract of land in Arkansas. Maxey and her husband retained a half-interest in the mineral estate when they sold that tract. Maxey's husband had passed away after the property was sold. In 2006, Maxey was approached by Kenneth Clifton Gainer, II, who was working as a landman for a company that was wanting to execute a lease to drill on the land formerly owned by Maxey and her husband. Gainer negotiated terms of the lease that were ultimately more favorable to Maxey and visited Maxey in Marlin, Texas to personally deliver the lease to her. At that time, Maxey was 81 years old and Gainer was 52.

After the lease was executed, Maxey received an up-front bonus. Ultimately natural gas was found on the tract and Maxey began receiving royalties. Prior to her

receiving the bonus and royalties, Maxey had struggled financially after the death of her husband. Once the bonus and royalties started being paid, Maxey became very financially secure. Maxey received approximately $65,000 per month in royalties.

Through the course of the negotiations, Maxey found out that Gainer was residing in Searcy, Arkansas, where she had resided with her husband, and Maxey enjoyed talking to Gainer because of that. Maxey and Gainer developed a relationship over the years prior to Maxey's death in 2011. Gainer and Maxey spoke on the phone two to six or seven times a week during the years of their relationship, and some of their conversations would last an hour or more. Gainer visited Maxey in Marlin approximately six times between 2006 and 2011. Each of the visits was for several hours and would occur on a single day when Gainer was traveling to or from Houston to visit relatives. Gainer would send Maxey flowers occasionally and they exchanged cards and gifts at holidays and birthdays. Gainer came to visit Maxey in the hospital shortly before her death. Every witness that testified stated that Maxey's relationship with Gainer made her very happy.

In 2008, Maxey sought financial advice from her grandson, David Pyland, who was a CPA, an Eagle Scout, and at that time was close to Maxey. David hired an attorney to prepare a trust and trust will, in which Maxey gave David half of the royalty proceeds from the Arkansas tract as received, with any expenses to be paid out of her remaining half. Upon Maxey's death, David would receive the full mineral interest and

the entirety of her residual estate after specific bequests to family members. David gave Maxey a redacted copy of the trust documents she had executed which did not include these terms. David deceived Maxey by leading her to believe that she would still control her assets. When Maxey asked David for a distribution from the trust, he refused to give it to her.

After David refused to give Maxey a distribution from the trust, Maxey hired a law firm to represent her in a suit to invalidate the trust. Maxey also began discussions with an experienced estate planning and probate attorney in the same firm named Geneva Turner to discuss the execution of a new will in August of 2009. Maxey hand-wrote and signed a revocation of the trust will on May 25, 2010. The litigation against David was settled and the trust agreement was set aside in a final judgment entered in October of 2010. Maxey and Turner spoke over the phone or met in person regarding the terms of Maxey's will multiple times prior to the execution of Maxey's last will. Turner provided Maxey with several drafts of the will and discussed potential beneficiaries with Maxey more than once. Maxey gave Turner a hand-written list with all of the beneficiaries from her trust will. David had led Maxey to believe that she was required to leave a gift to every member of her family, which she had done in the trust will. Maxey and Turner discussed this list and Maxey expressed to Turner which persons she wanted to name as beneficiaries under her new will and they discussed

why she was or was not naming specific persons as beneficiaries. Turner prepared a new list in accordance with Maxey's decisions, which was used to prepare the will.

Maxey executed her new will at Turner's office on July 9, 2010 in the presence of two witnesses and a notary. Maxey's will provided that her sister, Mary Adams, would receive Maxey's residence and all of her personal effects as well as 40 percent of her mineral interests and 40 percent of her residual estate. Maxey's niece, Suzanne Miller, was to receive 20 percent of Maxey's mineral interests and 20 percent of the residual estate. Gainer was to receive 40 percent of Maxey's mineral interests and 40 percent of the residual estate. Turner testified that Maxey told her that she wanted to include Gainer in her will because she was grateful to him for assisting her in receiving good lease terms and for making it possible for her to receive substantial income from her mineral interests in Arkansas. Turner further stated that Maxey was at all times aware of her assets and what she wanted done with them in her will. Turner believed that Maxey was competent at all times during their discussions regarding Maxey's will. Gainer was not present during any of Turner's meetings or discussions with Maxey and Maxey never appeared intimidated or agitated regarding the terms of her will, except for her anger toward David Pyland.

After Maxey passed away in December of 2011, her will was admitted to probate and Adams was named the executor of her estate. A contest to the will was filed by James L. Janes, Maxey's brother, and Lucy Pyland, Maxey's sister. Lucy Pyland passed

away during the pendency of this litigation and her estate is represented by Lucy's son, Sam Pyland. Woodrow Wilson Janes, Maxey's brother, was deceased but joined James and Lucy in the litigation through his executor, Dennis Janes. The will contestants were beneficiaries under the trust will and also heirs at law.

No additional evidence was presented regarding Maxey's relationship with her siblings and their children who are challenging the will. The challenge to the will is limited to the appellants' contention that Gainer must have improperly influenced Maxey into leaving him a significant portion of her estate.

The trial court conducted a bench trial and denied all of the appellants' claims of lack of testamentary capacity due to an insane delusion, undue influence, and fraud. In three issues, the appellants challenge the legal and factual sufficiency of the evidence regarding the lack of capacity due to an insane delusion and the factual sufficiency of the evidence regarding undue influence and fraud.[1]

## LEGAL AND FACTUAL SUFFICIENCY

### Standard of Review

In a nonjury trial, when no findings of fact or conclusions of law are filed, as here, we imply that the trial court made all necessary findings to support its judgment.

___

[1] The appellants framed their issues in terms of the trial court's implied findings that Maxey's testamentary capacity was not affected by her insane delusion, that there was no undue influence, and that the will was not procured by fraud were insufficient. While it is a fine distinction, the trial court's implied findings were that the appellants did not meet their burden of proof to establish that Maxey lacked testamentary capacity due to an insane delusion or that the will was executed as a result of undue influence or fraud. Nevertheless, we will address the issues in the same manner as the appellants.

*Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992). When a reporter's record is filed, as here, the implied findings are not conclusive, and a party may challenge both the legal and factual sufficiency of the evidence supporting those findings. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). The trial court's judgment must be affirmed if it can be upheld on any legal theory finding support in the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

When the party that had the burden of proof at trial complains of the legal insufficiency of an adverse finding, that party must demonstrate that the evidence establishes conclusively, i.e., as a matter of law, all vital facts in support of the finding sought. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). In reviewing the adverse findings for the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prevailing party, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex. 2005). Thus, because this was a bench trial, we must credit favorable evidence for upholding the validity of the will if a reasonable factfinder could, and disregard evidence contrary to the factfinder's findings. Moreover, we must not substitute our opinion on witness credibility for that of the factfinder. *See id*. at 816-17.

When the party complaining of the factual sufficiency of the evidence had the burden of proof at trial, it must demonstrate that the adverse finding is contrary to the

great weight and preponderance of the evidence. *Dow Chem.*, 46 S.W.3d at 242. We weigh all of the evidence, and we can set aside the adverse finding only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

We must also remember that it is within the province of the factfinder to determine the credibility of the witnesses and the weight to be given their testimony. *O'Connor v. Miller*, 127 S.W.3d 249, 254 (Tex. App.—Waco 2003, pet. denied). The trier of fact may believe one witness and disbelieve another, may resolve inconsistencies in the testimony of a witness, and it may accept lay testimony over that of experts. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). We may not pass upon a witness's credibility or substitute our judgment for that of the factfinder, even if the evidence might clearly support a different result. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998) (*citing Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986)).

### Insane Delusion

In their first issue, the appellants complain that the evidence supporting the trial court's determination that Maxey's testamentary capacity was not affected by an insane delusion was legally and factually insufficient. The appellants argue that Maxey was suffering from an insane delusion because she allegedly believed that she and Gainer

were in a romantic relationship and that insane delusion was the sole reason that she named Gainer as a beneficiary in her will.

Under Texas law, a testator lacks testamentary capacity if the terms of her will are influenced by an insane delusion. *Lindley v. Lindley*, 384 S.W.2d 676, 679 (Tex. 1964); *Orozco v. Orozco*, 917 S.W.2d 70, 74 (Tex. App.—San Antonio 1996, writ denied). An insane delusion is defined as "the belief of a state of supposed facts that do not exist, and which no rational person would believe." *Lindley*, 384 S.W.2d at 679; *Orozco*, 917 S.W.2d at 74-75. If there is a foundation in fact for the belief, the belief is not an insane delusion, "even though the basis may be regarded by others as wholly insufficient." *Orozco*, 917 S.W.2d at 75 (*quoting Navarro v. Rodriguez*, 235 S.W.2d 665, 667 (Tex. Civ. App.—San Antonio 1950, no writ)). A mere misunderstanding, mistake of fact, or illogical conclusion does not amount to an insane delusion. *Nohra v. Evans*, 509 S.W.2d 648, 653 (Tex. Civ. App.—Austin 1974, no writ); *Navarro*, 235 S.W.2d at 667. Rather, the misconception of fact must be "due to some organic defect in the brain or some functional disorder of the mind." *Lindley*, 384 S.W.2d at 679. Thus, to support a claim for insane delusion, there must be evidence "not only of a mental error affecting the terms of the will, but that the persistence of this mental error was caused by defective cerebration." *Id*.

Both Maxey's hairdresser and her long-time personal banker testified that, based on conversations they had with Maxey, Maxey believed that she was in a romantic

relationship with Gainer.  However, Adams and Turner testified that she did not hold that belief, but had laughed when asked if she and Gainer were romantically involved, and Maxey told Turner laughingly that "[a]n old girl can dream" when asked about whether she was romantically involved with Gainer.  Gainer did not appear in person at the trial but excerpts from his deposition were read into the record, and in those excerpts Gainer acknowledged that he was not romantically involved with Maxey and did not know whether she believed that they were romantically involved or not.

Adams testified that she had seen Maxey and Gainer together when he would come to visit Maxey and that Gainer made Maxey very happy.  There was no evidence from any witness that she ever appeared frightened or intimidated by Gainer at any time.  Phone records of calls between Gainer and Maxey showed that they had spoken on the phone for long periods of time around the times that Gainer was meeting with Maxey; however, there was no evidence of the substance of those conversations.  Every witness that testified agreed that Maxey was very happy about her relationship with Gainer, regardless of how it was categorized.

Gainer was portrayed by the appellants as an opportunist who had filed for bankruptcy in 2009 and had gambling problems.  Gainer was single and had never been married.  His adult life had been spent in various jobs in multiple locations.  Maxey had given Gainer two monetary gifts.  The first was in 2009 for approximately $10,000 and the second was in 2011 for approximately $11,900.  Gainer testified that Maxey had

given him those funds of her own volition to assist him with down payments on vehicle purchases. Gainer contended that he never asked Maxey for money. Maxey had also named Gainer the beneficiary of a $75,000 CD in 2007; however, in 2009, Gainer insisted that Maxey remove him as beneficiary and he was removed.

The appellants offered some of Maxey's medical records into evidence which showed that during some of the times when Turner had met with Maxey, Maxey suffered from short-term memory loss. Additionally, Maxey was in bad health for large periods of time prior to her death, including a long recovery from pneumonia. Other medical records showed the opposite; that Maxey was alert and oriented and was able to make her needs known. Every witness who testified stated that Maxey was very sharp mentally and knew exactly what was going on around her. Turner testified that she did not have any question that Maxey was competent to execute her will.

During Turner's conversations with Maxey, Maxey explained that she did not want to leave any of her assets to her brother James Janes because she had paid to put him through college and provided him a place to live at that time. They were not close at the time of the drafting of the will. James Janes had never invited Maxey to visit his home until approximately six weeks before Maxey's death.

Maxey also expressed that she and her sister, Lucy Pyland, were not close. Further, Maxey wanted to specifically exclude Sam and David Pyland from her will

even as heirs at law in the event all of her specific bequests failed, and Maxey requested that the draft of her will be amended to include a clause in her will to this effect.

The appellants argue that the only reason Maxey would have left the share to Gainer that she did was because she was suffering from the insane delusion that they were in a romantic relationship and that no rational person would have believed that they were. However, based on the evidence before the trial court, a rational person could have determined that Maxey and Gainer were merely friends and that she was grateful for Gainer's assistance in getting her more favorable terms on the lease and for his friendship, which she said brightened her life.

The evidence was conflicting as to what Maxey believed her relationship with Gainer to be, no direct evidence that Gainer influenced any decisions made by Maxey regarding her will, and there was uncontroverted evidence regarding her negative feelings toward most of her siblings and their children. The trial court's findings that Maxey was not suffering from an insane delusion is supported by the evidence. Because the appellants had the burden of proof at trial to establish an insane delusion, and keeping in mind the trial court's role as factfinder, we do not find that the evidence established as a matter of law all vital facts in support of the finding of an insane delusion, and the evidence was therefore legally sufficient to support the trial court's judgment. *See Dow Chem. Co.*, 46 S.W.3d at 241. Additionally, when we view the evidence in a neutral light, we also cannot say that the trial court's finding against the

appellants is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust, and therefore, the evidence was also factually sufficient. *See id.* at 242. We overrule issue one.

## Undue Influence

In their second issue, the appellants complain that the evidence was factually insufficient for the trial court to have found that there was no undue influence in the execution of Maxey's will. The appellants contend that Gainer's actions in causing Maxey's insane delusion regarding the alleged romantic relationship between them demonstrate that the will was executed as a result of undue influence by Gainer. The appellants argue that the trial court's determination of no undue influence was against the great weight and preponderance of the evidence.

Generally, a person of sound mind has the right to dispose of his or her property in the manner he or she wishes. *Rothermel v. Duncan*, 369 S.W.2d 917, 923 (Tex. 1963). To establish undue influence, a party contesting a will has had the burden of proof to show: (1) the existence and exertion of influence; (2) the effective operation of an influence so as to subvert the will or overpower the mind of the grantor at the time of the execution; and (3) the execution of an instrument the maker would not have executed but for such influence. *Id*. at 922. In order to meet their burden of proof regarding undue influence, the appellants were required to present evidence to establish that the influence was not only present, but was exerted with respect to

making the will by a preponderance of the evidence. *Id.*; *In re Estate of Ross*, No. 10-10-00189-CV, 2011 Tex. App. LEXIS 9461 at *14 (Tex. App.—Waco Nov. 30, 2011, no pet.) (mem. op.) (*citing Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.—Dallas 2005, pet. denied).

However, the exertion of undue influence cannot be inferred by opportunity alone. *Cotten*, 169 S.W.3d at 827; *see Rothermel*, 369 S.W.2d at 923 ("It is the law in Texas that a will cannot be set aside on proof of facts which at the most do no more than show an opportunity to exercise influence."). It is important to note that no two cases involving undue influence are alike, and each case must stand or fall depending upon the sufficiency of the facts proven. *Rothermel*, 369 S.W.2d at 921.

Undue influence may be proved by circumstantial or direct evidence. *See Rothermel*, 369 S.W.2d at 922. "Although a contestant may prove undue influence by circumstantial evidence, the evidence must be probative of the issue and not merely create a surmise or suspicion that such influence existed at the time the will was executed." *In re Estate of Graham*, 69 S.W.3d 598, 610 (Tex. App.—Corpus Christi 2001, no pet.) (*citing Rothermel*, 369 S.W.2d at 922).

In assessing whether the evidence was factually insufficient for the trial court to have found that no undue influence was exerted or existed, we assess the evidence of opportunities existing to exert influence, the circumstances surrounding the execution of the testamentary document, the existence of any fraudulent motive on the part of

those purportedly exerting influence, and the evidence, if any, of the testator's being "habitually subjected to the control of the party accused." *Estate of Davis*, 920 S.W.2d 463, 466 (Tex. App.—Amarillo 1996, writ denied) (*citing Rothermel*, 369 S.W.2d at 923). However, because it is not enough to simply show opportunity and motive to exert influence in order to make a finding of undue influence, there must have been adequate proof not only that undue influence by Gainer was present but also that it was in fact exerted with respect to the execution of the testamentary document in order to establish that the trial court's finding was against the great weight and preponderance of the evidence. *See Estate of Davis*, 920 S.W.2d at 466. Additionally, in assessing whether undue influence existed, we keep in mind that a person may lawfully request or attempt to persuade another to execute a favorable will, but unless those requests or attempts at persuasion are shown to be so excessive as to subvert the mind of the testator, they do not suffice to render the instrument invalid. *Id*.

The trial court's finding of no undue influence required, in part, an implied finding that undue influence by Gainer was not exerted with respect to making the will. While there was some evidence that Gainer and Maxey spoke on the phone during the periods surrounding the litigation to set aside the trust and the later execution of Maxey's will, there was also evidence that Gainer and Maxey had spoken on the phone regularly since 2006 when the lease was executed. Turner's multiple conversations with Maxey did not reveal any indications that Maxey was being influenced by Gainer in any

way. Mary Adams was very close to Maxey and did not ever observe any signs of influence by Gainer. Every witness, including Maxey's hairdresser, personal banker, investment broker, housekeeper, and Turner, testified that Maxey was mentally sharp, independent, and strong-willed up until the time of her death.

Based on our review of the record, using the appropriate standards for assessing the factual sufficiency of the evidence, we find that the trial court's determination that no undue influence was exerted in the execution of Maxey's will is factually sufficient. We overrule issue two.

*Fraud*

In their third issue, the appellants complain that the evidence was factually insufficient for the trial court to have found that there was no fraud perpetrated by Gainer. The appellants assert that Gainer's misrepresentation to Maxey that they were in a romantic relationship caused her to revise her will to include him as a beneficiary.

The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (*citing In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).

Our review of the record demonstrates that the trial court's implied finding that Maxey did not make Gainer a beneficiary of her will in reliance on Gainer's alleged representation that they were in a romantic relationship is not against the great weight and preponderance of the evidence. There was evidence in the record that Maxey was appreciative of Gainer's assistance in improving the terms of the lease and that she enjoyed his friendship. Further, there was evidence in the record as to the reasons why she did not include the appellants in her will. Therefore, the evidence was factually sufficient for the trial court to have found that there was no fraud in the execution of the will. We overrule issue three.

*Conclusion*

Having found that the evidence was sufficient, we affirm the judgment of the trial court.

TOM GRAY
Chief Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed July 9, 2015
[CV06]

